Tafford E. OLTZ, Plaintiff–Appellee,

v.

ST. PETER'S COMMUNITY HOSPITAL, Defendant–Appellant.

Tafford E. OLTZ, Plaintiff–Appellant,

v.

ST. PETER'S COMMUNITY HOSPITAL, Defendant–Appellee.

Nos. 87–3944, 87–3945.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 15, 1988.

Decided Nov. 28, 1988.

Michael J. Mulroney, Luxan & Murfitt, Helena, Mont., and Dan S. Bushnell, Kirton, McConkie & Bushnell, Salt Lake City, Utah, for defendant-appellant.

Urban L. Roth, Poore, Roth & Robinson, P.C., Butte, Mont. and Daniel S. Koch, McNally & Kurz, Washington, D.C., for plaintiff-appellee.

Before WRIGHT, WALLACE and HUG, Circuit Judges.

HUG, Circuit Judge:

This case concerns a Sherman Act § 1 claim for damages from an unlawful conspiracy among anesthesia service providers and the local hospital to enter an exclusive dealing contract and eliminate competition. By special verdict in a bifurcated trial, the jury found the defendant hospital liable and awarded damages of $421,831. The district court denied the hospital's motion for judgment notwithstanding the verdict or for a new trial on the issue of liability. *Sua sponte*, however, the district court ordered a new trial on damages after finding that the damages awarded were excessive. Defendant hospital challenges jury instructions, the jury's special verdict on liability, and the denial of the post-trial motion. Plaintiff challenges the order granting a new trial on damages. We affirm both orders of the district court.

## FACTUAL BACKGROUND

Defendant St. Peter's Community Hospital ("St. Peter's") is one of two hospitals in Helena, one of Montana's smaller cities. St. Peter's, however, is the only hospital in the area open to the general public and equipped to perform general surgery. At trial, the parties stipulated that St. Peter's enjoys a market share of 84% of general surgical services in Helena.

Plaintiff Tafford E. Oltz and his wife are registered nurse anesthetists. A nurse anesthetist does not have the broad and extensive medical education that is required for an M.D. anesthesiologist; however, nurse anesthetists are clinically qualified to provide certain anesthesia services under the supervision of the M.D. performing the surgery. *See Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1471 (9th Cir. 1985). Thus, nurse anesthetists may provide anesthesia services in direct competition with M.D. anesthesiologists.

In late 1974, Mr. and Mrs. Oltz were living in Bozeman, Montana. At the invitation of St. Peter's, Mr. Oltz began administering anesthesia at St. Peter's in Helena pursuant to a written billing agreement. Under the agreement, Mr. Oltz submitted his bills to St. Peter's, rather than to the patient, and received 90 percent of his billings as full payment directly from St. Peter's. The agreement expressly provided that Mr. Oltz was an independent contractor and not an employee of the hospital. The agreement was automatically renewable each month until one of the parties gave written notice of termination.

When Mr. Oltz began at St. Peter's, three M.D. anesthesiologists were also administering anesthesia there. Mr. Oltz, however, performed as a free lance anesthetist, administering anesthesia under the clinical supervision of the operating surgeon or obstetrician. Mr. and Mrs. Oltz moved from Bozeman to Helena in early 1977. During this time, Mrs. Oltz was practicing as a nurse anesthetist in communities outside of Helena.

By early 1978, the number of M.D. anesthesiologists with hospital privileges at St. Peter's had risen to four. Evidence at trial revealed that Mr. Oltz and the anesthesiologists were in direct competition for many of the cases at St. Peter's. Mr. Oltz' popularity among the surgical staff had grown so that some doctors, particularly obstetricians, preferred his services. For example, Mr. Oltz administered lumbar epidural anesthesia, a type of spinal anesthesia commonly used to assist women in childbirth, which some of the anesthesi-

ologists were reluctant to perform. Moreover, Mr. Oltz charged $9.30 per anesthesia unit, while the anesthesiologists charged $14 per unit.

The dispute over Mr. Oltz' independent billing status became divisive among the general medical staff, and some of the anesthesiologists began threatening to leave the hospital. On March 30, 1978, St. Peter's organized the Department of Anesthesia. The anesthesiologists comprised the department's membership. During department meetings in the presence of Howard Purcell, Jr., the administrator at St. Peter's, the department discussed termination of Mr. Oltz' billing contract. They also drafted policies encouraging supervision by anesthesiologists of all anesthesia administered at St. Peter's, removed Mr. Oltz from the anesthesia call schedule, and declined administrative as opposed to clinical supervision of Mr. Oltz' practice at St. Peter's.

On September 14, 1978, the anesthesiologists wrote to Purcell and demanded that the hospital terminate the billing contract with Mr. Oltz. The anesthesiologists forwarded copies of their demand to the chief of staff and to the St. Peter's Board of Trustees. The board discussed the demand and referred the matter to a joint conference committee of the medical staff. The anesthesiologists presented a report to the joint committee, outlining the impact of nurse anesthetists on anesthesiologist incomes.

Near December 28, 1978, Purcell telephoned Mr. Oltz and informed him the billing contract was terminated. After receiving correspondence from Mr. Oltz' attorney and the antitrust section of the Montana Attorney General's office, however, the board of trustees rescinded the termination. The board submitted the matter to an ad hoc committee of medical staff, directing them to recommend a resolution in compliance with the standards of the Joint Commission on Accreditation of Hospitals ("JCAH") regarding supervision of nurse anesthetists.

The ad hoc committee recommended that St. Peter's institute supervision of all nurse anesthetists by anesthesiologists but

"grandfather" Oltz' free lance position as an exception to the policy. The committee further recommended placing Oltz within the administrative supervision of the department of anesthesia while leaving his clinical supervision to the operating surgeons. Upon inquiry, the committee received confirmation from JCAH personnel that such supervision would satisfy JCAH standards. The medical staff, including the anesthesiologists, voiced approval of the recommendation, and the committee submitted the recommendation to the board of trustees.

Even though they had approved the recommendation, at least three of the four anesthesiologists continued to openly discuss plans of leaving St. Peter's. On April 9 and 11, 1979, the Board of Trustees met to discuss the committee's recommendation. The Board minutes indicate that the board rejected the recommendation, in part, because the anesthesiologists were threatening to leave. Instead, the board decided to offer an exclusive contract for anesthesia services.

St. Peter's advertised nationally for proposals from anesthesiologists to enter an exclusive contract. St. Peter's received proposals from various groups of doctors but ultimately awarded the contract to an association formed by three of the four anesthesiologists already in Helena. On April 29, 1980, Purcell wrote Mr. Oltz that the exclusive contract would commence and Oltz' billing contract would terminate on July 14, 1980.

Following the termination, the anesthesiologists at St. Peter's offered Mr. Oltz a salaried position as an employee in their association but under their clinical supervision. The salary offered to Mr. Oltz was $40,000. Mr. Oltz rejected the offer and advertised nationally for employment. Ultimately, Mr. Oltz and his wife accepted positions on the University of Iowa faculty, and Mr. Oltz eventually became chief nurse anesthetist at a regional medical center of the university. After Mr. Oltz' departure from St. Peter's, each of the anesthesiologists in Helena experienced increased annual earnings by 40 to 50%.

## PROCEDURAL HISTORY

Mr. Oltz sued St. Peter's and the four anesthesiologists under section one of the Sherman Act. The four doctors settled, paying $462,500, and the case was dismissed as to them. The case against St. Peter's proceeded to a bifurcated jury trial on a theory of conspiracy to boycott and exclude competition. The jury found liability by special verdict.

Before the trial on damages, the district court ruled in limine to exclude evidence of Mrs. Oltz' earnings after 1980. The jury then awarded Mr. Oltz $212,182 damages for loss of income to the date of trial and $209,649 damages for loss of future income.

St. Peter's moved for judgment notwithstanding the verdict or for a new trial on the issue of liability. The district court denied the motions but *sua sponte* ordered a new trial on damages. *Oltz v. St. Peter's Community Hosp.*, 656 F.Supp. 760, 765 (D.Mont.1987). The district court found that the damages awarded were excessive and that the court had caused the excess by erroneously excluding evidence of Mrs. Oltz' income after 1980. *Id.* at 764–65.

Both parties sought our permission to appeal the district court's post-verdict ruling under 28 U.S.C. § 1292(b). We granted permission, and the parties perfected appeals pursuant to Fed.R.App.P. 5(d).

## ISSUES PRESENTED

St. Peter's appeal from the jury verdict on liability and Oltz' appeal from the order granting a new trial on damages raise four issues that we must decide:

(1) whether the district court improperly removed from the jury the factual determination of the relevant market;

(2) whether the duration and purpose of the exclusive contract between St. Peter's and several M.D. anesthesiologists preclude a finding of intent to injure competition;

(3) whether the jury properly concluded that St. Peter's was capable of con-

spiring with its medical staff under Sherman Act § 1; and

(4) whether the district court abused its discretion by ordering a new trial on damages.

## DISCUSSION

### I. *Liability Under Sherman Act § 1*

#### A. *Introduction*

By its terms, section one of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1 (1982). The Supreme Court, however, has long recognized that section one was intended to prohibit only those restraints that unreasonably restrain competition. *Business Electronics Corp. v. Sharp Electronics Corp.*, — U.S. —, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). Ordinarily, whether particular concerted conduct unreasonably restrains competition is determined under a "rule of reason" analysis, which is a case-by-case study in which "the fact finder weighs all of the circumstances of a case." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). In contrast, the Court has identified certain discrete categories of restraints so manifestly anticompetitive in nature that they are illegal per se, dispensing with the need for case-by-case evaluation. *Id.* at 50, 97 S.Ct. at 2557. The district court instructed the jury to evaluate Oltz' claim against St. Peter's exclusively under the rule of reason.[1]

■ Our traditional framework for analyzing a rule of reason claim under section one of the Sherman Act is well settled and easily summarized. A section one claimant must initially prove three elements: (1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend

to harm or restrain competition; and (3) which actually injures competition. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1391 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984); *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290 (9th Cir.), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). After the claimant has proven that the conspiracy harmed competition, the fact finder must balance the restraint and any justifications or pro-competitive effects of the restraint in order to determine whether the restraint is unreasonable. *Los Angeles Memorial Coliseum*, 726 F.2d at 1391; *Calculators Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1338 (9th Cir.1983). This balancing process requires a thorough examination into all the surrounding circumstances. *Cascade Cabinet Co. v. Western Cabinet & Millwork Inc.*, 710 F.2d 1366, 1373 (9th Cir.1983).

Each of the three issues raised by St. Peter's appeal corresponds to one of the initial elements of proof in a rule of reason case. We address each one in reverse order.

#### B. *Injury to Competition*

■ St. Peter's urges us to find an utter failure of proof on the issue of injury to competition because the district court incorrectly defined the relevant product and geographic market. In particular, St. Peter's objects to the district court's instruction that the jury should evaluate the impact of the conspiracy on "competition among providers of anesthesia services in the Helena area." St. Peter's maintains that market relevance presents a factual question and that the instruction improperly decided the question as a matter of law.

■ Reduced to its essence, St. Peter's position is that the district court erroneous-

---

1. Group boycotts or concerted refusals to deal constitute per se categories into which Oltz contends this case may fall. Courts hesitate to apply the boycott per se rule to an arrangement, however, when the economic impact of the arrangement is not obvious. *See Harkins Amusement Enters., Inc. v. General Cinema Corp.*, 850

F.2d 477, 486 (9th Cir.1988). Moreover, the Supreme Court has counseled against enlarging the "'boycott' pigeon hole" by invoking the per se rule. *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458, 106 S.Ct. 2009, 2018, 90 L.Ed. 2d 445 (1986). We decline the invitation to invoke per se analysis in this case.

ly directed a verdict as to the relevant market. In reviewing a directed verdict, we assume the same role as the trial court. *Twin City Fire Ins. Co. v. Philadelphia Life Ins. Co.*, 795 F.2d 1417, 1423 (9th Cir.1986); *see also West Am. Corp. v. Vaughan–Bassett Furniture Co., Inc.*, 765 F.2d 932, 934 (9th Cir.1985) (review of directed verdicts is *de novo*). Accordingly, we may affirm a directed verdict on an issue only when the evidence, taken most favorably to the losing party, and all justifiable inferences therefrom are insufficient to support a contrary finding. *Los Angeles Memorial Coliseum*, 726 F.2d at 1387. But if no substantial evidence will support a contrary conclusion, a directed verdict is required, even in an antitrust case. *Id.; Cleary v. National Distillers and Chem. Corp.*, 505 F.2d 695, 696 (9th Cir.1974).

Proving injury to competition in a rule of reason case almost uniformly requires a claimant to prove the relevant market and to show the effects upon competition within that market. *Kaplan*, 611 F.2d at 291; *Gough v. Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir.1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). *See Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1300 (9th Cir.), *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). Defining the relevant market is a factual inquiry ordinarily reserved for the jury. *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 876, 884, 93 L.Ed.2d 830 (1987). The term "relevant market" encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the " 'area of effective competition' ... where buyers can turn for alternate sources of supply." *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir.1977) (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366, 369 n. 1, 93 S.Ct. 1022, 1026 n. 1, 35 L.Ed.2d 359 (1973) and *Standard Oil Co. v. United States*, 337 U.S. 293, 299–300 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949)). The product market includes the pool of goods or services that enjoy reasonable interchange-ability of use and cross-elasticity of demand. *Syufy Enterprises*, 793 F.2d at 994, (citing *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956) (the "Cellophane" case)).

We agree with St. Peter's that the district court decided the relevant market issue as a matter of law. The court confined the jury's evaluation to Helena as the relevant geographic area of competition and anesthesia services as the relevant product. According to St. Peter's, however, the relevant geographic area extends throughout the nation, and the relevant product consists of the providers of anesthesia services whom hospitals seek to attract to their facilities. St. Peter's contends that unrebutted evidence established that Oltz sought new work and St. Peter's solicited bids for an exclusive anesthesia contract by advertising in nationally circulated publications. St. Peter's maintains this evidence would substantially support a factual finding that the relevant market is broader than the market for anesthesia services in Helena, invalidating the district court's directed verdict on that issue.

St. Peter's arguments seek to cast the search for the market in this case as a choice between the local market for patient services and the broader job market for anesthesia service positions. Such a choice is entirely unnecessary. The M.D. anesthesiologists, the hospital, and Oltz operated in both markets. Thus, the exclusive arrangement potentially affected both markets, and both were relevant to the search for competitive harm. Even if we accept St. Peter's contention that the job market was national and competition in it suffered no injury, the analysis could not have ended there. An evaluation of the impact on competition in the patient market for anesthesia service was required.

Through its instruction, the district court confined the jury's search for competitive harm in the patient services market to the Helena area. The conclusion that Helena was the relevant geographic market for assessing such harm is inescapable. St. Peter's enjoyed the overwhelm-

ing majority of the market for general surgery. As a result, an anesthesia service provider desiring to serve that market had to work at St. Peter's. More importantly, there was no evidence that patients could effectively turn outside of St. Peter's for alternate sources of anesthesia services. There was also no evidence of any other service that was a reasonable substitute for anesthesia services in terms of use and cross-elasticity of demand. Accordingly, we conclude that anesthesia services and the Helena area framed the appropriate product and geographic components of a relevant market in which the jury could assess injury to competition.

Our conclusion that injury to competition could exist in either the job market for anesthesia service positions or the patient market for anesthesia care is supported by *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* a case on which St. Peter's erroneously relies. 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In *Jefferson Parish,* an M.D. anesthesiologist who was denied staff privileges claimed that the defendant hospital and a group of four M.D. anesthesiologists had unlawfully conspired to restrain trade in violation of Sherman Act § 1 by virtue of a contract granting the group exclusive staff privileges. *Id.* at 5, 104 S.Ct. at 1554. The Supreme Court acknowledged that "[t]he exclusive contract had an impact on two different segments of the economy: consumers of medical services, and providers of anesthesiological service." *Id.* at 7, 104 S.Ct. at 1555. The contract affected consumers who elected to have surgery at the defendant hospital by foreclosing the option of selecting, or having their surgeon select, the plaintiff or others to administer anesthesia. *Id.* The contract affected providers of anesthesia services because it precluded the hospital from offering staff privileges to anyone but the exclusive group of anesthesiologists. *Id.* The Court ultimately affirmed dismissal of the claim, however, because the plaintiff did not sufficiently show any harm to competition. *Id.* at 29–31, 104 S.Ct. at 1568. The defendant was only one hospital of several in a large metropolitan area. *Id.* at 7, 104 S.Ct. at 1555. Even if some patients or surgeons at the hospital preferred the services of other anesthesia service providers, no evidence established that they could not go to other hospitals in the area to obtain them. *Id.* at 30, 104 S.Ct. at 1567. Moreover, no evidence indicated whether the market in which the anesthesiologists competed for staff privileges was merely local or state wide. *Id.* at 29, 104 S.Ct. at 1567.

Like the exclusive contract in *Jefferson Parish,* St. Peter's arrangement with the M.D. anesthesiologists potentially affected two different segments of the economy. One segment was the market in which anesthesia service providers compete for staff privileges at hospitals; the other was the patient market for anesthesia services. Consideration of the impact of the exclusive contract on competition does not require acceptance of one segment as the relevant market and rejection of the other. Rather, as implied by *Jefferson Parish,* a showing of injury to competition in either market suffices for the rule of reason.

St. Peter's also relies on *Collins v. Associated Pathologists, Ltd.* in arguing that anesthesia service providers and not anesthesia services constitute the relevant product. 844 F.2d 473 (7th Cir.1988), *petition for cert. filed.* In *Collins,* the court held that pathologists and not pathology services were the relevant market for analyzing the competitive effect of an exclusive contract for pathology privileges at the defendant hospital. *Id.* at 478. The court affirmed dismissal of the Sherman Act § 1 claims because the excluded plaintiff could show no significant effect upon the market in which pathologists compete for jobs. *Id.* The court rejected pathology services as a relevant product because no evidence showed a demand for such services that was separate from the demand for hospital services in general. *Id.*

Unlike the situation in *Collins,* the evidence at trial revealed a demand for individual anesthesia service providers. Indeed, some surgeons and obstetricians actually preferred Oltz over the M.D. anesthesiologists for certain anesthetic procedures. The district court was justified in

finding that such services constitute a relevant product market in which the jury should evaluate competitive harm.

■ Our conclusion that the district court correctly limited the jury's search for competitive harm to the patient market in Helena is compelled by still another reason. Defining the market is not the aim of antitrust law; it merely aids the search for competitive injury. Once defined, the relevant market demarcates "objective benchmarks" for separating reasonable and unreasonable restraints. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n. 21, 97 S.Ct. 2549, 2559 n. 21, 53 L.Ed.2d 568 (1977). It requires the claimant to demonstrate harm to the economy beyond the claimants' own injury. *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir.1983) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). In so doing, market definition furthers antitrust policy: the protection of competitive processes and not individual competitors. *Gough*, 585 F.2d at 386. But the failure to pinpoint precisely the relevant market through detailed market analysis is not uniformly fatal to a claim under Sherman Act § 1. *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986).

Because market definition and market power are merely tools designed to uncover competitive harm, proof of "actual detrimental effects, such as a reduction of output, can obviate the need ... [for] elaborate market analysis." *Id.* at 460–61, 106 S.Ct. at 2018–19. For example, in *Indiana Fed'n*, member dentists in several cities collectively withheld dental x-rays from dental insurers seeking to evaluate patients' claims for benefits. The F.T.C. found that the policy violated section one of the Sherman Act and issued a cease and desist order under section five of the F.T.C. Act. The dentists challenged the F.T.C. order for a lack of specific findings concerning the definition of the market in which competition was unreasonably re-

strained. The Supreme Court affirmed the order because the F.T.C. had found actual adverse effects on competition in those areas where the federation dentists predominated. The Court concluded that this finding of actual harm to competition, when "viewed in light of the reality that markets for dental services tend to be relatively localized, [was] legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis." *Id.* at 461, 106 S.Ct. at 2019.

The reasoning of *Indiana Fed'n* is applicable to the challenged restraint in this case. St. Peter's and the M.D. anesthesiologists faced no appreciable competition in serving the surgical and anesthesiological needs of the Helena area. By special verdict, the jury found that the exclusive anesthesia contract and the termination of Oltz had actual detrimental effects on competition among anesthesia service providers in that area. The evidence amply supports that finding. Some patients and surgeons who preferred the services of Oltz were hindered from obtaining them. Furthermore, the price of anesthesia services and the incomes of the M.D. anesthesiologists rose dramatically because of the challenged restraint. Given that the ability to raise price and to exclude competition are hallmarks of market power, the finding of actual harm to competition suffices under Sherman Act § 1 even in the absence of extended market analysis.

### C. Intent to Restrain Competition

■ St. Peter's next seeks a judgment notwithstanding the verdict, arguing that the exclusive contract was short in duration and served a legitimate business purpose and that Oltz' billing contract was terminable at will. St. Peter's contends these factors establish that it pursued a legal goal in the least restrictive manner possible, rendering a finding of intent to unlawfully restrain competition unjustified.[2] We review the propriety of a judg-

---

2. In a related argument, St. Peter's complains that the instruction on the factors the jury

should consider in balancing the benefits of the restraint against the detrimental effects inade-

ment notwithstanding the verdict under the same standards applied by the district court; a judgment notwithstanding the verdict is proper when the evidence permits only one reasonable conclusion as to the verdict. *Peterson v. Kennedy*, 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).

In support of this argument, St. Peter's has cited us several authorities that have denied relief for exclusive staffing arrangements at hospitals. These authorities recognize that exclusive arrangements generally permit hospitals to control the identity, number and quality of persons who work there. *See, e.g., Konik v. Champlain Valley Physicians Hosp. Medical Center*, 733 F.2d 1007, 1014–15 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Dos Santos v. Columbus–Cuneo–Cabrini Medical Center*, 684 F.2d 1346, 1353–54 (7th Cir.1982). St. Peter's even asserts that no reported decision has upheld Sherman Act liability against a hospital because of an exclusive staffing arrangement. Furthermore, St. Peter's forecasts that its liability will mean no hospital in a small rural community could ever negotiate an exclusive contract with a group of anesthesiologists without running afoul of the antitrust laws.

St. Peter's argument is flawed in at least two respects. First, the argument ignores one-half of the conspiracy about which the jury received evidence. Ample evidence supports Oltz' claim that the M.D. anesthesiologists and St. Peter's conspired to terminate his billing contract as well as to enter the exclusive contract. Thus, the jury could justifiably have concluded that the goal was, at least partially, the elimination of Oltz as a direct competitor of the anesthesiologists. Such a goal would furnish the necessary intent for a section one claim.

■ Second, the assertion that no rural hospital could lawfully grant an exclusive

contract if St. Peter's is now liable is clearly overstated. The rule of reason requires an evaluation of each challenged restraint in light of the special circumstances involved. *Business Electronics Corp. v. Sharp Electronics Corp.*, —— U.S. ——, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). That the analysis will differ from case to case is the essence of the rule. As noted above, the conspiracy St. Peter's joined involved more than the establishment of an exclusive contract. The absence of a goal to remove Oltz and reduce the competition for the patients whom he served would have dramatically altered the outcome of this case. Our decision, therefore, cannot be read as establishing any rule applicable to other situations involving rural hospitals engaged in exclusive contracts for staff privileges. The legality of those arrangements will depend on their individual case merit.

### D. *Conspiracy*

■ The final issue raised by St. Peter's concerns the jury's finding that St. Peter's conspired with the anesthesiologists. St. Peter's maintains it lacks the capacity to conspire with the anesthesiologists as a matter of law. Although "[t]he nature of an entity and its ability to combine or conspire in violation of § 1 is [ordinarily] a fact question," *Los Angeles Memorial Coliseum*, 726 F.2d at 1387, St. Peter's urges us to adopt a rule of law that hospitals cannot conspire with their medical staff. Accordingly, we face a question of law and our review is *de novo*. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

The phrase "contract, combination, or conspiracy" limits application of the Sherman Act to concerted conduct by more than one person or single entity. *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir.1988). Unilateral conduct by a single entity does not implicate Sherman

---

quately described the weight the jury should assign to the short-term duration of the exclusive contract. St. Peter's failed to preserve this matter for appeal by objecting to the instruction

before the jury retired for deliberations. *See* Fed.R.Civ.P. 51. Accordingly, we do not address it.

Act § 1 regardless of the magnitude of the restraint on competition; only section two covers unilateral conduct. *Id.* (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984)). In *Copperweld*, the Supreme Court concluded "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." 467 U.S. at 769, 104 S.Ct. at 2741. "The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Id.* Thus, no dangers against which section one was designed to protect can arise. *Id.*

In holding a hospital legally incapable of conspiring with its medical staff under Sherman Act § 1, some courts have relied on the rule that a corporation cannot conspire with its officers and directors. *See Weiss v. York Hosp.*, 745 F.2d 786, 814–17 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *Potters Medical Center v. City Hosp. Ass'n*, 800 F.2d 568, 573 (6th Cir.1986). The Eleventh Circuit, however, has rejected the analogy. *Bolt v. Halifax Hosp. Medical Center*, 851 F.2d 1273, 1280 (11th Cir.1988). In *Bolt*, a physician whose staff privileges were revoked alleged a conspiracy in violation of Sherman Act § 1 among the hospital and the members of the medical staff who conducted the peer review that caused his termination. *Id.* at 1276–77. The court reasoned that the hospital and each member of the medical staff were legally separate entities. *Id.* at 1280. Their relationship, therefore, differed from the relationship between a corporation and its officers or employees, whose acts more frequently fall within the scope of their agency. *Id.*

We find *Bolt* persuasive: Although the M.D. anesthesiologists may have been the agents of St. Peter's for some purposes, their interests were not as wed as the ties between a corporation and its officers or employees. St. Peter's did not pay the anesthesiologists a salary; they billed the patients they served directly. The anesthesiologists were independent contractors

pursuing their personal economic interests when they pressured St. Peter's to eliminate Oltz as a direct competitor. Those interests were sufficiently independent so that the collaborated conduct between the anesthesiologists and St. Peter's coalesced economic power previously directed at disparate goals.

St. Peter's relies on *Weiss v. York Hosp.* in arguing that St. Peter's could not conspire with the anesthesiologists because they were too closely related to manifest bilateral conduct under Sherman Act § 1. 745 F.2d 786 (3d Cir.1984). *Weiss*, however, is readily distinguishable. There, an osteopath who was denied staff privileges alleged a conspiracy among the entire medical staff and the hospital. *Id.* at 813. "The medical staff was empowered to make staff privilege decisions on behalf of the hospital." *Id.* As a result, the court reasoned that the staff, as an entity, acted for the hospital like an officer would have acted for a corporation. *Id.* This relationship precluded a finding of conspiracy. *Id.*

Unlike the staff in *Weiss*, the M.D. anesthesiologists were not empowered to act for St. Peter's. The board of trustees held the power to terminate Oltz and award the exclusive contract. Therefore, the anesthesiologists were not acting like an officer in relation to the corporation, and St. Peter's had the capacity to conspire with them.

■ Arguing in the alternative, St. Peter's maintains the evidence of conspiracy does not support the verdict. We review jury verdicts to ascertain whether they are supported by substantial evidence; namely, admissible evidence adequate to support the jury's conclusion. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1013–14 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

Because direct evidence of concerted action in violation of antitrust laws is so rare, the Supreme Court has traditionally granted fact finders some latitude to find collusion or conspiracy from parallel conduct and inferences drawn from the circumstances. *See American Tobacco Co. v.*

*United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Such latitude is not without limits, and courts have fashioned various tests designed to limit the permissible situations justifying inferences of conspiratorial conduct. *E.g., Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (the evidence must tend to exclude the possibility of independent rather than collusive action); *Zoslaw v. M.C.A. Distributing Corp.,* 693 F.2d 870, 884 (9th Cir.1982) (plaintiff must demonstrate that the parallel acts were against each conspirator's self-interest and, thus, not based on a good faith business judgment), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983); *Kruezer v. American Academy of Periodontology,* 735 F.2d 1479, 1487 (D.C.Cir.1984) (plaintiff must show the acts by defendant were against its own independent economic interests and show a motivation for defendant to enter the conspiracy).

Relying on these authorities, St. Peter's contends that Oltz offered no evidence of a motivation for St. Peter's to enter the conspiracy and no evidence of conduct by St. Peter's against its own independent economic interest. But, contrary to St. Peter's contention, the jury did not need to infer conspiracy from circumstantial evidence. As the district court found below, ample direct evidence of collusion was offered to the jury. Oltz and the anesthesiologists feuded for a substantial period, and in 1979, all the anesthesiologists threatened to leave unless Oltz' status as a free-lance operator ended. Minutes of the Board of Trustees indicate that the board knew about the threat and feared the quality of the hospital might deteriorate as a result. From such evidence, the jury justifiably could have concluded that the trustees knew of and submitted to pressure from the anesthesiologists, thereby joining the conspiracy. *See Oltz v. St. Peter's Community Hosp.,* 656 F.Supp. 760, 763 (D.Mont.1987).

## II. *New Trial on Damages*

■ Oltz urges us to reverse the district court's order granting a new trial on damages under Fed.R.Civ.P. 59 and to reinstate the jury's verdict. In granting the order *sua sponte,* the district court found "that the damages awarded were excessive." *Oltz,* 656 F.Supp. at 764. The court stated the excess resulted from its erroneous ruling in limine upon stipulation by the parties to exclude evidence of Mrs. Oltz' income after 1980. *Id.*

At trial, the jury considered the joint returns of Mr. and Mrs. Oltz as evidence of Mr. Oltz' income during the years before 1980. Those returns juggled deductions for business expenses between Mr. and Mrs. Oltz, and at trial Mr. Oltz adjusted the figures to show a higher income than disclosed in the returns. The jury did not receive Mr. and Mrs. Oltz' joint tax returns for the years following 1980, which showed a combined income substantially greater than their combined income before 1980.

The district court reasoned that this evidence, when taken together, created a factual question of whether Mr. and Mrs. Oltz were joint venturers in their professional practices so that damages should equal what Mr. Oltz lost as a joint venturer and not as an individual. *Id.* The court also thought the evidence of their combined post–1980 income was relevant to show their opportunities outside of Helena, Montana and, therefore, Mr. Oltz' proclivity to remain at St. Peter's in the absence of his termination. *Id.* Although St. Peter's did not object to the ruling in limine, the court concluded an injustice had resulted, which authorized the court to grant relief. *Id.*

Oltz contends that our review should be *de novo* because the appropriateness of the new trial order turns exclusively on the correctness of the underlying ruling in limine. The ruling in limine, Oltz maintains, presents a pure question of law commanding no deference to the trial court. *See Allstate Ins. Co. v. Springer,* 269 F.2d 805, 808 (6th Cir.1959), *cert. denied,* 361 U.S. 932, 80 S.Ct. 370, 4 L.Ed.2d 353 (1960). We are unpersuaded. The incorrectness of the evidentiary ruling is little more than a point of reasoning cited in support of the district court's finding that the awarded damages were excessive. This presents

more than a mere legal question, and the traditional standard for reviewing new trial orders must apply. Accordingly, we must decide whether the district court abused its discretion in ordering a new trial on damages. *Robins v. Harum*, 773 F.2d 1004, 1006 (9th Cir.1985). Reversal would be inappropriate without an "abuse of discretion as to each ground upon which the court based its determination; if any ground is reasonable, the decision must be upheld." *Peacock v. Board of Regents, Etc.*, 597 F.2d 163, 165 (9th Cir.1979) (citing *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir.1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977)). Because we conclude that the finding of excessive damages was reasonable, we do not reach the propriety of the district court's reasoning regarding the joint venture issue and the duration that Mr. Oltz' would have remained at St. Peter's.

■ Once the district court, after viewing the evidence most favorably to the prevailing party, concludes that excessive damages were awarded, it has two alternatives: it may grant a motion for a new trial or condition denial of such a grant upon acceptance of remittitur by the prevailing party. *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir.1983). The district court may order a new trial, even though substantial evidence supports the jury's verdict. *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir.1976) (citing *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957)), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). On the issue of excess, Oltz has done nothing more than detail for us the evidentiary pattern he presented to the jury in order to establish his damages. Such evidence may indeed have been substantial enough to support the jury's award. It does not, however, render a conclusion of excess unreasonable.

The jury considered tax returns in evaluating Mr. Oltz' pre-termination income. These returns juggled the expenses of Mr. and Mrs. Oltz. In considering Mr. Oltz' post-termination income, the jury considered nothing pertaining to Mrs. Oltz'

income even though Mr. and Mrs. Oltz filed joint returns showing a combined income far greater than their combined income while at Helena. The paucity of evidence on Mrs. Oltz' post–1980 income and the references to her income before 1980 could easily have altered the jury's conclusions. The juggling of expenses may have created confusion about Mr. Oltz' income. Moreover, the absence of evidence on Mrs. Oltz' post–1980 income may have created a false impression among jurors concerning the actual impact and result of the termination on Mr. Oltz. The mere plausibility of such possibilities demonstrates the reasonableness of the district court's conclusion that the jury awarded Oltz too much money. Given the district court's superior position to evaluate such matters, we find nothing that persuades us to dispute its finding.

■ In a final argument, Oltz contends the district court exceeded its authority to act spontaneously under Fed.R.Civ.P. 59(d). Rule 59(d) permits the district court to order a new trial on its own motion for any reason that would justify a new trial on motion of any party. St. Peter's stipulated to the exclusion of evidence on Mrs. Oltz' post–1980 income. Oltz maintains that St. Peter's could not, therefore, have raised the ruling in limine as a ground for seeking a new trial. According to Oltz, the inability of St. Peter's to contest the ruling precluded the district court from using the ruling as a basis for spontaneously ordering a new trial on damages. The grant of a new trial, however, did not rest upon the ruling in limine in isolation. Instead, the district court's finding of excess damages prompted the order. St. Peter's could certainly have sought relief under Rule 59 on that ground. Accordingly, Oltz' argument is meritless.

## CONCLUSION

St. Peter's has presented no grounds for reversal of the jury's verdict on liability. The district court did not improperly define the relevant market, and St. Peter's did not lack capacity to conspire with the M.D. anesthesiologists. Moreover, ample evidence supports the jury findings of conspir-

acy, intent, and injury to competition. Similarly, Oltz has failed to show adequate grounds for reversing the order granting a new trial on damages. The district court's finding of excessive damages was reasonable and the order was within its discretion. The verdict on liability and the order for a new trial on damages are affirmed, and the case is remanded to the district court.

AFFIRMED AND REMANDED.