**BROOKS FIBER COMMUNICATIONS OF TUCSON, INC., a Delaware Corporation, Plaintiff,**

v.

**GST TUCSON LIGHTWAVE, INC., an Arizona Corporation, Intervenor–Defendant.**

**GST TUCSON LIGHTWAVE, INC., an Arizona Corporation, Counterclaimant,**

v.

**BROOKS FIBER COMMUNICATIONS OF TUCSON, INC., a Delaware Corporation, Counterdefendant.**

**No. CV 95–655 TUC JMR.**

United States District Court, D. Arizona.

Dec. 23, 1997.

Stephen M. Dichter, Margaret R. Mahoney, Bryan Cave LLP, Phoenix, AZ, E. Perry Johnson, Leo J. Asaro, Bryan Cave LLP, St. Louis, MO, for Counterdefendants Brooks Fiber Properties, Inc. and Brooks Fiber Communications of Tucson, Inc.

Belin Lamson McCormick Zumbach Flynn, Des Moines, IA, Edward M. Mansfield, Nancy M. Coomer, Tucson, AZ, for Counterclaimant.

### ORDER

ROLL, District Judge.

Pending before the Court are the following motions: 1) Counterclaimant GST Tucson Lightwave's (Lightwave) Motion for Summary Judgment on Count One of its counterclaim; 2) Counterdefendant Brooks Fiber Communications' (Brooks) Motion for Summary Judgment on all counterclaims; and 3) Brooks' Motion to Exclude the Expert Testimony of Christopher Pflaum.

For the reasons set forth below, all motions for summary judgment are **DENIED,** and Brooks' motion to exclude expert testimony is also **DENIED.**

### BACKGROUND

Brooks and Lightwave are rivals providing telecommunications services in the Tucson area through construction and operation of local fiberoptic cable systems which connect consumers with long-distance companies. Both Brooks and Lightwave are "competitive access providers" (CAPs), which compete with the dominant local exchange carrier, U.S. West.

In early 1995, Brooks and Tucson Electric Power Company (TEP) entered into an agreement which 1) gave Brooks exclusive use of TEP's facilities in constructing a fiberoptic system, and 2) prohibited TEP from granting access to any other CAP from April 1995 to April 1996. As a result of another CAP's objection to this agreement, in August 1995, the City of Tucson placed a moratorium on any use of TEP facilities for fiberoptic construction until other CAPs were allowed equal access.

Brooks filed this suit in response, requesting injunctive and monetary relief against the City of Tucson. Lightwave intervened in the action in September 1995. Brooks and Lightwave are the only remaining parties to this litigation and only Lightwave's counterclaims against Brooks are pending. Lightwave alleges that Brooks, by entering the TEP–Brooks agreement, violated sections 1 and 2 of the Sherman Act (the Act) as well as the Arizona antitrust act, and engaged in tortious interference and unfair competition under state law.

Lightwave seeks summary judgment on its counterclaim alleging violations of section 1 of the Sherman Act. Brooks has moved for summary judgment on all of Lightwave's counterclaims and also seeks to exclude the testimony of Lightwave's expert, Christopher Pflaum.

### CROSS MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The initial burden rests on the moving party to point out the absence of any genuine issue of material fact. Once this burden is met, the party resisting summary judgment must demonstrate through production of probative evidence that an issue of fact remains to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When judging the evidence at the summary judgment stage, a court is required to view all inferences in the light most favorable to the non-moving party. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). The ultimate question is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Count One: Section 1 of the Sherman Act

In Count One of its counterclaim, Lightwave alleges that Brooks violated section 1 of the Sherman Act. Lightwave requests damages of $1,469,433, the amount incurred for digging and laying cable underground in downtown Tucson because TEP poles were unavailable. Both parties seek summary judgment regarding this counterclaim.

█ Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. The Supreme Court, however, has construed the Act to only prohibit those practices that *unreasonably* restrain trade. While the Court has carved out several categories of restraints that are illegal per se under the Act, most inquiries as to whether certain practices unreasonably restrain competition are determined under a "rule of reason" analysis, *i.e.,* a case by case determination. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Here, the parties do not dispute that a "rule of reason" analysis applies to this case. To prove a violation under section 1 of the Sherman Act under the "rule of reason" analysis, Lightwave must establish the following: 1) an agreement or conspiracy between two or more persons or business entities; 2) intent to harm or restrain competition; and 3) actual restraint or injury to competition. *Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1445 (9th Cir.1988). If these elements are proven, the factfinder then balances any pro-competitive effects and justifications for the alleged unlawful practice in determining whether there is an antitrust violation. *Id.*

#### 1. Agreement or Conspiracy

The parties do not dispute the first element; Brooks admits that it entered into the exclusive use agreement with TEP.

#### 2. Intent to harm or restrain competition

Brooks claims that it did not enter the agreement with TEP to unlawfully harm or restrain competition. Brooks contends that it legitimately engaged in "competition for the contract," a term coined by Judge Easterbrook in *Paddock Publications, Inc. v. Chicago Tribune Co.,* 103 F.3d 42, 45 (7th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2435, 138 L.Ed.2d 196 (1997). Essentially, this means that where a supplier must select one competitor from a group of equally positioned competitors, the fact that only one of the competitors prevails in obtaining the contract is not an unreasonable restraint of trade. Brooks argues that it was the only CAP willing to negotiate with TEP on TEP's proposed terms for a facilities-use agreement. Brooks also claims that its agreement with TEP actually enhanced competition by providing consumers with alternatives to using U.S. West to connect with long distance companies.

Lightwave claims that because of the exclusivity clause, the Brooks–TEP agreement was not merely a legitimate exercise in "competition for the contract." Lightwave alleges that Brooks intended that the agreement effectively eliminate all other CAPs from the Tucson market and that there would have been several facilities-use agreements with TEP but for the exclusivity agreement.

The exclusivity provision which is at the heart of this counterclaim was not inserted for the benefit of TEP; rather it was included at the insistence of Brooks. Even viewing the evidence in the light most favorable to Brooks, the only reasonable inference to be drawn is that Brooks sought this exclusivity provision in order to restrain competition among CAPs. Restraint of competition being apparent, it must then be determined whether the restraint was unreasonable. The answer to that inquiry depends, in part, upon whether the competition among CAPs constituted competition for a legally cognizable submarket. That issue is addressed below.

### 3. Actual restraint or injury to competition

■ Under the third prong of the rule of reason analysis, a claimant must show that the complained-of practices *actually* injured competition. "Proving injury to competition in a rule of reason case almost uniformly requires a claimant to prove the relevant market and to show the effects upon competition within that market." *Oltz,* 861 F.2d at 1446. In other words, a claimant must ordinarily show that an alleged antitrust violator had the necessary "market power" to unlawfully restrain competition. Both parties have divergent views on what comprises the relevant market in this case and both parties request summary judgment on the restraint element.

#### Lightwave's Position on Restraint of Competition

Although Lightwave claims the existence of a cognizable submarket consisting of CAPs, it argues that it is entitled to summary judgment based upon proof of actual detrimental effects arising from the Brooks–TEP agreement. Lightwave maintains that if actual detrimental effects have been established, the matter of definition of the relevant market is inconsequential.

■ The Supreme Court and the Ninth Circuit have recognized that market definition and market power are merely aids for determining injury to competition. *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445

(1986); *Oltz,* 861 F.2d at 1448. Because relevant market is merely a tool to determine whether actual injury occurred, proof of actual detrimental effects may dispense with the requirement for a detailed market analysis. *See, e.g., Oltz,* 861 F.2d at 1448. Brooks refers to this as the "quick look" analysis. The ability to raise prices, reduce output, and exclude competition may evidence actual detrimental effects in the absence of a market analysis. *Id.* Lightwave claims that it can show that the Brooks–TEP exclusive agreement produced actual detrimental effects in the market, and for this reason, summary judgment should be entered for Lightwave.

Brooks claims that the "quick look" analysis used in *Indiana Fed'n* only applies to very limited circumstances and is wholly inappropriate in this case. Brooks claims that Lightwave has failed to show any direct evidence that Brooks actually controlled or raised prices while reducing output. *Rebel Oil Co. Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).

■ Lightwave's generalizations regarding control of prices or reduction in output by Brooks are insufficient to show the kind of "hard" and "direct" evidence of actual detrimental effects required by *Oltz* and *Rebel Oil.* Because the so-called "quick look" analysis does not apply, Lightwave is relegated to showing traditional market power as to its allegation of an antitrust violation under section 1 of the Sherman Act. Lightwave acknowledges that relevant market is a factual issue in analyzing market power and concedes that Lightwave is not entitled to summary judgment on this alternative basis. Accordingly, as to Lightwave's motion for summary judgment, it is unnecessary to address the issue of submarkets.

#### Brooks' Position on Restraint of Competition

Brooks moves for summary judgment on Count One of Lightwave's counterclaim, asserting that Lightwave has failed to produce a genuine issue of fact regarding Brooks' market power in the relevant market. Brooks contends that U.S. West monopolizes

"98–100%" of the local telephone services market and, accordingly, the Brooks–TEP agreement could not possibly have restrained competition to any meaningful extent.

Lightwave contends, however, that a genuine issue of material fact exists as to the applicable market. Lightwave maintains that the CAP market and not the overall market is the relevant market. The CAP market is comprised of Brooks, Lightwave, and other CAPs "competing" with U.S. West. Lightwave alleges that it has shown an issue of material fact exists as to which market should govern the antitrust analysis so as to preclude the granting of Brooks' motion for summary judgment.

■ Determining relevant market for antitrust purposes involves identification of a group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1374 (9th Cir.1989). Defining the relevant market is ordinarily a factual inquiry for the jury. *Syufy Enters., v. American Multicinema, Inc.,* 793 F.2d 990, 994 (9th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). Where appropriate, the relevant market may be narrowed, despite interchangeability of use and cross-elasticity of demand, to account for identifiable submarkets. *Thurman,* 875 F.2d at 1374.

■ A leading case recognizing submarkets is *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). There, the Supreme Court listed several factors to be considered in ascertaining whether a cognizable submarket exists. These include 1) whether the industry or public recognizes the proposed submarket; 2) whether the products involved have peculiar characteristics or uses; 3) whether unique production facilities are involved; and 4) whether distinct customers, distinct prices, or price change sensitivity are apparent in the submarket. *Id.* 370 U.S. at 325.

In support of its submarket contention, Lightwave argues that both CAP services and prices are significantly different from those of U.S. West, justifying the recognition of a separate CAP-only market. Lightwave claims that CAP service offers advanced fiberoptic technology, different packages of services not available from U.S. West, and redundancy. Lightwave cites *Syufy Enterprises* and *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704 (7th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), as support for the proposition that a significant difference in services justifies a separate market finding. In *Syufy,* the Ninth Circuit held that theaters showing "industry-anticipated top grossing" films provided a service different from theaters showing recent but not "top grossing" films so as to justify a market distinction. In *Photovest Corp.,* the Seventh Circuit held that "drive-thru" photo processing constituted a separate market from other types of photo processing.

Lightwave also claims that price variations between CAP and dominant local exchange carriers justify the differentiation of markets, citing *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1477 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997) There, the Ninth Circuit reversed the district court's grant of summary judgment against a finding of a submarket. In concluding that evidence of a submarket existed, the Ninth Circuit relied in part on the price discrepancy of 15–20% between for-profit hospitals and non-profit hospitals in Las Vegas. *See also Photovest Corp.,* 606 F.2d at 713–14 (the ability of "drive-thru" photo processors to charge 20% more than other photo processing retailers supported finding of a "drive-thru" submarket); *United States v. Archer–Daniels–Midland Co.,* 866 F.2d 242, 246 (8th Cir.1988), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989) (a price differential of 10–30% justified a finding of separate markets for high fructose corn syrup and sugar, despite the fact that these products were "functionally interchangeable"). Lightwave alleges that both outside and within Tucson, the price difference between CAP and incumbent carrier services can range from 20%–50%, justifying a market distinction.

Finally, Lightwave offers the expert testimony of Christopher Pflaum, Ph.D., which is the subject of Brooks' motion to exclude.

Pflaum has concluded that an identifiable CAP submarket exists in the larger market for local telephone services. Pflaum bases his market theory on the preference for reliability. He asserts that because CAP service is of better quality and is more reliable than U.S. West service, some customers will purchase CAP service regardless of the cost differential between the two. Pflaum also suggests that some consumers will purchase both CAP and U.S. West service for a safety net or because their businesses require redundancy of telecommunications service.

Differences in service and price could reasonably justify a finding that a CAP submarket exists independent of the dominant provider, U.S. West. The relevant market is an issue normally reserved for the factfinder. *Syufy Enters.*, 793 F.2d at 994.

■ Clearly, conflicting inferences may be drawn as to whether the relevant market for purposes of this claim is the overall market or the CAP market.

The cross motions for summary judgment on Count One of Lightwave's counterclaim are denied.

### Count Two: Section 2 of the Sherman Act

Lightwave also seeks damages based upon attempted monopolization and conspiracy to monopolize claims under section 2 of the Sherman Act. Brooks moves for summary judgment on both claims.

#### 1. Attempted Monopolization

■ An attempted monopolization claim under section 2 of the Sherman Act requires proof of the following elements: 1) specific intent to monopolize; 2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and 3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Of course, a plaintiff must also prove standing. *See Great Western Directories, Inc. v. Southwestern Bell Tele. Co.*, 63 F.3d 1378, 1388–90 (5th Cir.1995) (To establish business or property interest as required for standing to bring action for attempted monopolization, plaintiff must show that it in-

tended and was prepared to enter the market.).

As with the section 1 Sherman Act claim previously discussed, proving an attempted monopolization requires a determination of intent and market power. *Spectrum Sports, Inc.*, 506 U.S. at 459. For the reasons previously discussed regarding the section 1 claim, because factual issues are presented regarding relevant market, summary judgment is inappropriate.

#### 2. Conspiracy to Monopolize

■ Brooks also moves for summary judgment on Lightwave's claim of conspiracy to monopolize. A conspiracy to monopolize claim under section 2 of the Sherman Act has three elements: 1) a concerted action; 2) overt acts in support of the conspiracy; and 3) a specific intent to monopolize. *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir.1996), *cert. denied*, — U.S. ——, 118 S.Ct. 49, 139 L.Ed.2d 14 (1997). *See also Syufy*, 793 F.2d at 1000.

■ "[N]o particular level of market power or 'dangerous probability of success' has to be alleged or proved in a conspiracy [to monopolize] claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken." *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). Even though Lightwave is not required to show market power on this claim, Lightwave has not requested, and Brooks is not entitled to, summary judgment on this count.

### Count Three: Arizona Antitrust Act

■ Brooks moves for summary judgment on Lightwave's claim of antitrust violations under state law. The Arizona Antitrust Act, A.R.S. §§ 44–1401 *et. seq.*, mirrors federal antitrust law. Because summary judgment is inappropriate on the federal claims under the Sherman Act, it is also inappropriate on the state law claims. Accordingly, Brooks' motion for summary judgment on this count is denied.

### Counts Four and Five:  State tort law claims

Brooks also moves for summary judgment on Lightwave's tort law claims.

#### 1.  Interference with Business Expectancy

■ In Count Four of its counterclaim, Lightwave argues that Brooks tortiously interfered with Lightwave's business expectancies under state law.  An actor may legitimately cause a third person not to enter or continue business relations with a competitor if:  1) the relation concerns a matter involved in the competition between the actor and the competitor;  2) the actor does not employ improper means;  3) the actor does not intend thereby to create or continue an illegal restraint of competition;  and 4) the actor's purpose is at least in part to advance his or her interest in competition with the other. *Ulan v. Vend–A–Coin, Inc.*, 27 Ariz.App. 713, 717, 558 P.2d 741, 745 (1976).

■ Lightwave must show that Brooks used "improper means" in proving tortious interference. *Id.* "Improper means" encompasses antitrust and monopolization violations, but also includes fraudulent or inequitable conduct. *See Bar J Bar Cattle Co., Inc. v. Pace*, 158 Ariz. 481, 484, 763 P.2d 545, 548 (App.1988) (tortious interference encompasses "illegal or inequitable" business dealings).  Because conflicting inferences can be drawn from the facts presented, including whether Lightwave had any business expectancy to sell CAP services in Tucson by early 1995 and what role the TEP–Brooks' exclusivity agreement played in interfering with that expectancy, summary judgment is inappropriate.

#### 2.  Unfair Competition

Lightwave's other state tort law claim is grounded on "unfair competition."  Lightwave alleges that Brooks deceived Lightwave and other CAP providers about the existence and terms of Brooks' original proposal and agreement with TEP. Brooks moves for summary judgment on this count, arguing that Arizona law defines the tort of "unfair com-petition" narrowly in terms of trademark and trade secret protection.

■ Lightwave maintains that more recently, courts have found that "unfair competition" reaches beyond the field of trademarks or trade secrets.  Lightwave points to the Restatement (Third) of Unfair Competition § 1 (1995), which broadly defines "unfair competition" to include, in part, "acts or practices ... actionable ... under federal or state statutes."  Lightwave has brought claims under both the federal and state antitrust legislation.  Under a Restatement analysis, Lightwave's claims would survive Brooks' motion for summary judgment.  Where there is no pertinent Arizona law, Arizona courts will follow the Restatement of the Law whenever applicable. *Bristor v. Cheatham*, 75 Ariz. 227, 236, 255 P.2d 173, 179 (1953); *First Nat'l Bank of Arizona v. Bennett Venture Ltd.*, 130 Ariz. 562, 563, 637 P.2d 1065, 1066 (App.1981). *See also Jesik v. Maricopa County Community College Dist.*, 125 Ariz. 543, 611 P.2d 547 (1980) (Arizona follows the Restatement of Torts in the absence of state law to the contrary).  Brooks' motion for summary judgment is denied.

### BROOKS' MOTION TO EXCLUDE EXPERT TESTIMONY

Brooks has also moved to exclude the testimony of Lightwave's expert, Christopher Pflaum.  Pflaum offers testimony relating to the existence of a CAP-only submarket in the larger market for local telecommunications services.

■ Brooks first claims that Pflaum is not qualified to give his opinion on the relevant market issue.  Pflaum holds a Ph.D. in finance and operations management and a masters degree in business administration, Pflaum is the president of an economic consulting firm, and he has consulted and testified in other antitrust cases as well as in other telecommunications matters.  Lightwave has presented a sufficient foundation for Dr. Pflaum's opinions about the local telecommunications market.

Second, Brooks claims that Pflaum's testimony should be excluded under the Supreme Court's decision in *Daubert v. Merrell Dow*

*Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). There, the Supreme Court listed four factors to be utilized in determining whether expert testimony is sufficiently reliable: 1) whether the proffered theory has been tested; 2) whether the theory has been subjected to peer review and publication; 3) the established rate of error; and 4) whether the theory has garnered general acceptance in the field. *Id.* 509 U.S. at 593–94. Brooks claims that Pflaum's testimony fails under each of these prongs.

■ Lightwave argues that the *Daubert* test does not apply to Pflaum's testimony. Federal Rule of Evidence 702 defines expert testimony as any "scientific, technical, or other specialized knowledge." However, the Supreme Court limited *Daubert* to "scientific" knowledge. The Ninth Circuit has reiterated that *Daubert* applies only to scientific knowledge. *McKendall v. Crown Control Corp.,* 122 F.3d 803 (9th Cir.1997) (*Daubert* found inapplicable to testimony of experienced mechanical and metallurgical engineer that forklift should have had safety device). Lightwave contends that *Daubert* only applies to "classically hard science" or novel scientific tests or theories, not to Pflaum's construction of a submarket under basic economic modeling principles.

■ *Daubert* is inapplicable to Dr. Pflaum's testimony. Here, Pflaum is only relying on basic economic modeling principles regarding price and cross-elasticity as the basis for his conclusions that a CAP-only submarket exists. His application may be unique, but the underlying theories on which he relies are not. As discussed above, the Supreme Court's decision in *Brown Shoe* as well as circuit case law support findings of submarkets in certain antitrust cases. Thus, the weight to be accorded Pflaum's testimony is a jury question. For all of these reasons, Brooks' motion to exclude is denied.

### CONCLUSION

For the foregoing reasons,

1) Brooks' and Lightwave's cross motions for summary judgment on Count One of the counterclaim are **DENIED;**

2) Brooks' motions for summary judgment on the remaining counterclaims are **DENIED;**

3) Brooks' motion to exclude the expert testimony of Christopher Pflaum is **DENIED.**