MINNESOTA ASSOCIATION OF NURSE ANESTHETISTS, Gayle McKay, Ladonna Schweer, John Okonek, Bernadine Okonek, Annette Atchison, Fred Benjamin, Bart Barry, Faye Leatherman, Sue Milbach, Sandra Henschke, Judith A. Schmidt and Gary Hagen, Plaintiffs,

v.

UNITY HOSPITAL, Mercy Hospital, William MacNally, President and Chief Executive Officer of Unity and Mercy Hospitals, Allina Health System Corp., Mark Sperry, M.D., Gary Baggenstoss, M.D., John Murphy, in his capacity as Vice President of Unity and Mercy Medical Centers, James Cumming, M.D., John Rydberg, M.D., Midwest Anesthesia, P.A., Thelma M. Albay, M.D., Minda Castillejos, M.D., Teri Heil, M.D., Sang Hong, M.D., Ted Janossy, M.D., Raymond Kloepper II, M.D., John Magdsick, M.D., Thomas Maggs, M.D., Thomas Polta, M.D., John Roseberg, M.D., Jai Suh, M.D., Jeffrey Yue, M.D., Mark Eggen, M.D., Metropolitan Anesthesia Network, Allen Tank, Theodore Grindal, Esq., Craig Johnson, M.D. (both individually and in his capacity as President of the Minnesota Society of Anesthesiologists), St. Cloud Hospital, John Frobenius, Chief Executive Officer of St. Cloud Hospital, Linda Chmielewski, Vice President Hospital Operations of St. Cloud Hospital, Anesthesia Associates of St. Cloud Ltd., Gary A. Boeke, M.D., Philip F. Boyle, M.D., L. Michael Espeland, M.D., Alan D. Espelien, M.D., Paul J. Halverson, M.D., Lanse C. Lang, M.D., William H. Rice, M.D., Allan Reitz, M.D., and Annette E. Zwick, M.D., Defendants.

Civil No. 4–96–804 (ADM/JGL).

United States District Court,
D. Minnesota,
Fourth Division.

May 7, 1998.

Herbert J. Stern, Stern & Greenberg, David S. Stone, Freedman & Stone, Roseland, NJ and William S. Rosen, Rosen & Rosen, St. Paul, MN, for Plaintiffs.

John D. French, Jay D. Christiansen, Richard A. Duncan, Elizabeth H. Schmiesing, Faegre & Benson, Minneapolis, MN, for "Allina" Defendants.

Thomas Fraser, Laurie J. Miller, Cynthia Jokela, Fredrickson & Byron, Minneapolis, MN, for "MAPA" Defendants.

Kevin J. Hughes, Paul R. Harris, Hughes, Mathews & Didier, St. Cloud, MN, for St. Cloud Hospital Defendants.

Joseph M. Musilek, Eric Tostrud, Lockridge Grindal Nauen & Holstein, Minneapolis, MN, for "AASC" Defendants.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### INTRODUCTION

The above-entitled matter came on for hearing before the undersigned United States District Judge on January 21, 1998, pursuant to Defendants' motion for summary judgment. This case alleges a conspiracy in which Defendants purportedly conspired to eliminate the use of certified registered nurse anesthetists in the provision of anesthesia services. Plaintiffs characterize the gravamen of their Complaint as follows: "To maintain their unusually high level of compensation, to facilitate their fraudulent billing and to increase their dominant position in the market, defendant anesthesiologists have conspired with defendant hospitals to terminate plaintiff CRNAs who they see as a threat both to their unusually high level of compensation and to the future of their profession." Pl.'s Mem. in Opp'n to S.J., at 1.

In their Complaint, Plaintiffs assert the following claims: violation of § 1 of the Sherman Act through unreasonable restraint on competition; violation of Minnesota's Antitrust Statute; violation of § 1 of the Sherman Act through illegal boycott; violation of § 2 of the Sherman Act through monopoly, attempted monopolization, and conspiracy to monopolize; violation of §§ 1, 2, 14, 15, and 26 of the Sherman and Clayton Acts through an illegal tying arrangement; violation of federal antitrust laws through the denial of essential facilities; violation of the Minnesota Deceptive Trade Practices Act; violation of the Minnesota Whistleblower Statute; and civil conspiracy.[1]

### BACKGROUND

#### I. *The Parties*

The Plaintiffs in this action include twelve certified registered nurse anesthetists ("CRNAs") and the Minnesota Association of Nurse Anesthetists ("MANA"). The Defendants include the Allina Health System, Mercy and Unity Hospitals and two of their administrators (the "Allina Defendants"); the anesthesiologists who work at Mercy and Unity Hospitals, their practice group, and its administrator (the "MAPA Defendants"); the St. Cloud Hospital and two of its administrators (the "St. Cloud Hospital Defendants"); the anesthesiologists who work at St. Cloud Hospital and their practice group

---

1. United States District Judge Michael J. Davis dismissed a number of Plaintiffs' other claims in his September 29, 1995, Order ruling on Defendants' motion to dismiss. The dismissed claims included: violation of Minnesota's Consumer Fraud Act, tortious interference with contractual and prospective business and economic relations, unfair competition under Minnesota law, breach of implied covenant of good faith and fair dealing, and wrongful termination in violation of public policy.

(the "AASC Defendants").[2] Defendants Unity and Mercy Hospitals, which are located in Fridley, Minnesota, and Coon Rapids, Minnesota, respectively, are jointly owned and administered by Allina Health System.

## II. *Factual Background*

The landscape of the health care industry has undergone kaleidoscopic changes in the last decade. Today, models of health care built on cost containment and managed care predominate. This transformation has resulted in a number of conflicts which, like the present one, involve difficult human resource issues.

Anesthesiology is a medical specialty in which a qualified medical practitioner renders a patient insensitive to pain during invasive medical procedures. Both anesthesiologists ("MDAs") and CRNAs may administer anesthesia. Although CRNAs do not have the extensive medical education required for MDAs, CRNAs are clinically qualified to administer anesthesia under many circumstances. Stone Aff., Ex. 199, 201. Plaintiffs contend that the delivery of anesthesia services has historically been dominated by nurses rather than doctors. Stone Aff., Ex. 673. According to Plaintiffs, this balance began to shift to some extent when anesthesia delivery became more profitable. Despite this shift, sixty-five percent of the 26 million anesthetics in the United States are still administered by CRNAs. Stone Aff., Ex. 1.

A significant portion of the recipients of anesthesia services are Medicare patients. As a result, the method and criteria for Medicare reimbursement are critically important for both MDAs and CRNAs. Due to the increasing profitability of the profession, Plaintiffs contend that MDAs across the country began to systematically tender multiple, contemporaneous Medicare bills for services provided by CRNAs but ostensibly supervised by MDAs. In an effort to discourage MDAs from billing for anesthesia services in which they played a. *de minimus* role, Congress passed the Tax Equity And Fiscal Responsibility Act of 1982 ("TEFRA"). Plaintiff's Ex. 673, 199, 201. The TEFRA regulations "recognize that an anesthesiologist may either: (1) 'personally perform' the anesthesia service; (2) 'medically direct' concurrent anesthesia procedures (that is, two, three or four concurrent procedures) involving qualified anesthesia personnel, usually certified registered anesthetists ("CRNA"); or (3) medically supervise anesthesia procedures (that is, more than four concurrent cases)." Stone Aff., Ex. 280. Under the TEFRA regulations, "medical direction" applies only to concurrent procedures, never to a single case. *Id.* In short, TEFRA required that MDAs maintain a minimal level of involvement, supervisory or otherwise, in order to obtain Medicare reimbursement.

After implementation of the TEFRA regulations, the Health Care Financing Administration ("HCFA") continued to negotiate the delicate balance between reimbursement for MDA and CRNA services. Stone Aff., Ex. 280. Prior to 1989, hospitals billed Medicare collectively for CRNA services and other necessities such as anesthetics, equipment, and operating room time. The Omnibus Budget Reconciliation Act of 1986, however, authorized HCFA to develop a CRNA fee schedule payment system to allow separate Medicare reimbursement for services rendered by CRNAs.[3] *Id.* Consequently, in 1989, CRNAs

---

**2.** Plaintiffs also alleged claims against attorney Theodore Grindal, who represented the Minnesota Society of Anesthesiologists. Judge Davis, however, dismissed all claims against Grindal in his September 29, 1995 Order.

**3.** An official at the Health Care Financing Administration illustrated the difficulty of delineating a payment system for services rendered by CRNAs and/or MDAs:

> [HCFA] differentiated, for payment purposes between the services of CRNAs who are medically directed and the services of non-medical-

ly directed CRNAs, that is CRNAs working without being directed by an anesthesiologist. One issue HCFA had to address in these regulations was how to pay CRNAs where concurrent procedures aren't involved but both a CRNA and an anesthesiologist are involved in a single procedure. Both the proposed regulation ... and the final regulation ... included a regulatory provision that advised CRNAs that, if an anesthesiologist and a CRNA are both involved in a single anesthesia service, for purposes of determining whether to pay the CRNA, we would deem the service to have

could bill Medicare directly. CRNA services, however, are not billable when an MDA is billing for full-time service. The 1989 regulations provided: "When an anesthesiologist and an anesthetist are both involved in a single anesthesia service, the service is considered personally performed by the anesthesiologist. No separate payment is ordinarily recognized for the anesthetist's service." Stone Aff., Ex. 18. Plaintiffs contend that this and other changes to the reimbursement methodology fostered competition between MDAs and CRNAs.

Plaintiffs allege that Defendant MDAs disregarded the Medicare reimbursement requirements and used CRNAs, who were then employed by the hospitals, to actually provide the anesthesia services while the MDAs themselves spent little or no time in the operating room. Stone Aff., Exs. 534, 527, 578. Defendant MDAs allegedly continued to bill Medicare "as if they were personally present in the room and providing the services." Pl.'s Mem. in Opp'n to Df.'s Mot. for S.J., at 5. MDA billing practices allegedly became contentious after 1989, when CRNAs began to bill directly for the same services. Medicare and other insurers refused to pay both a CRNA bill and an MDA bill for the same procedure. Stone Aff., Ex. 242.

In 1991, Travelers Insurance Company performed an audit at Mercy Hospital, which revealed a problem with this "double-billing." Pursuant to its postpayment review of CRNA charges on Medicare claims, Travelers requested that Mercy repay $1476.91 for duplicative bills submitted by MDAs and CRNAs. Stone Aff., Ex. 18. The President of the American Society of Anesthesiology ("ASA") expressed alarm that "this intolerable situation has arisen because of claims being submitted by CRNAs for anesthesia services, which has led these carriers to issue new policies recognizing only the CRNA claim." Stone Aff., Ex. 456.

Theodore Grindal, an attorney for the state association of anesthesiologists, allegedly circulated a letter dated October 28, 1992, (the "Grindal letter") to all anesthesiologists in the state concerning Medicare reimbursement for MDAs and CRNAs. Plaintiffs contend the Grindal letter was a carefully constructed "blueprint" designed to eliminate CRNAs as competitors. The letter cautions the anesthesiologists that "active participation in such a hospital business decision making process (i.e. firing CRNAs) could expose anesthesiologists to legal liability under the antitrust laws." Stone Aff., Ex. 24. Although Grindal is no longer a defendant in the case, Plaintiffs allege that this letter provided the vehicle through which the conspiracy to restrain trade was effectuated.

In March 1994, Unity and Mercy Hospitals terminated the CRNAs employed at the hospitals.[4] Plaintiffs assert that the terminations were the product of a conspiracy to eliminate CRNAs as competitors in the provision of anesthesia services. Defendants maintain that the hospitals instead reorganized their anesthesia departments to address the economic realities of a dynamic health care market in which Medicare reimbursement was rapidly declining. The Defendant hospitals contend that the terminations were necessary to reduce costs and achieve the economic efficiency concomitant with solesource contracting. Duncan Aff. I, Ex. 1.

Unity and Mercy Hospitals entered into an exclusive contract with the practice group, Midwest Anesthesia, P.A. ("MAPA"), in March 1994, to provide anesthesia services at the hospitals for five years. Duncan Aff. I, Ex. 2. Rather than have the hospitals employ CRNAs directly, the contract required that MAPA provide CRNA coverage. Unity and Mercy offered the CRNAs the opportunity to continue working at the hospitals as either employees of the anesthesiologists or as independent subcontractors to the anesthesiolo-

---

been personally performed by the anesthesiologist. In such cases, we also allow payment of the CRNA if the CRNA furnishes documentation to the carrier explaining the medical necessity for two anesthesia providers.
Stone Aff., Ex. 280 (letter to David S. Stone from the HCFA).

4. The record suggests that administrators at Unity/Mercy began to consider terminating the CRNAs in early 1993. Stone Aff., Exs. 292, 295, 212.

gists. The CRNAs formerly employed by Unity and Mercy formed an organization called Nurse Anesthesia Services, P.A. ("NASPA"), which then contracted with MAPA to provide CRNA services at Unity and Mercy. Wasche Aff., ¶ 7.

Despite the transition to sole-source contracting, Defendants maintain that nothing has changed in the clinical practice of CRNAs at Unity and Mercy. Defendants continue to use the "anesthesia care team" model, in which an MDA supervises two or more CRNAs in the administration of anesthesia. Haviland Aff., ¶ 3. Defendants maintain that CRNA responsibilities have not changed significantly and that CRNAs continue to engage in the same scope of practice that existed before the reorganization. Duncan Aff. I, Ex. 4.

In November 1994, St. Cloud Hospital also reorganized its anesthesia department in a similar fashion.[5] For Fiscal Year 1993, St. Cloud Hospital experienced a net loss of $247,000 on anesthesia reimbursement. Hospital administrators at St. Cloud contend that they anticipated greater losses if they continued to employ CRNAs directly. *Id.* As a result, they terminated the CRNAs and entered into an exclusive contract with the anesthesiology group at the hospital, Defendant Anesthesia Associates of St. Cloud ("AASC"). Plaintiffs contend that the reorganization at St. Cloud Hospital occurred as the result of a conspiracy with other Defendants to eliminate CRNAs. Parsons Aff., ¶ 45. Defendants maintain, however, that St. Cloud Hospital, like Unity and Mercy, was merely responding to the economic realities of declining Medicare reimbursement and cost containment pressures. *Id.*

Defendant St. Cloud Hospital invited the previously employed CRNAs to continue practicing at the hospital as employees of AASC. Chmielewski Dep., at 255–56. Some CRNAs accepted employment with AASC; some did not. Honkomp Aff., ¶ 12. Defendants maintain that there has been no change in the clinical practice of CRNAs at St. Cloud Hospital.

Plaintiffs also allege that CRNAs who reported fraudulent billing practices among the MDAs suffered retaliation from the Defendant Hospitals. Plaintiffs contend that in the wake of the Traveler's audit certain CRNAs met with hospital administrators to advise them that the CRNAs had observed widespread fraudulent billing by MDAs. Plaintiff's allege that they were terminated by the Defendant hospitals, not only to eliminate them as competitors, but also in retaliation for reporting alleged Medicare fraud.

## DISCUSSION

### I. *Standard for Summary Judgment*

A party is entitled to summary judgment as a matter of law only if it can show that no genuine issue of material fact exists. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). There is no different or heightened standard for summary judgment in a complex antitrust case. *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1490 (8th Cir.1992). The basic inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Id.* at 249, 106 S.Ct. at 2511.

At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–1377 (8th Cir. 1996) (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510). Rather, the court's function is to determine whether a dispute about a material fact is genuine, that is, whether a reasonable jury could return a verdict for the nonmoving party based on the evidence. *Id.* at 1377. The evidence of the non-movant is to be believed, and all justifiable inferences

---

5. Hospital administrators at St. Cloud Hospital made the decision to terminate CRNAs and reorganize the anesthesia department in the fall of 1993. The hospital, however, did not complete its transition to sole-source contracting until November 1994.

are to be drawn in favor of the non-moving party. *Id.* " 'If reasonable minds could differ as to the import of the evidence,' " summary judgment is inappropriate. *Id.* (quoting *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.)

Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of demonstrating the absence of a genuine issue for trial. *Matsushita Elec., Ind.. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). When a summary judgment motion is properly supported, the opposing party may not rest on the allegations or denials of its pleadings, but must come forward with sufficient evidence to demonstrate a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348.

## II. *Antitrust Claims*

### A. Antitrust Injury

■■■■ To succeed on an antitrust claim, a plaintiff must prove that there has been "antitrust injury." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Antitrust injury is defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Id.* The injury to the private plaintiff must coincide with the public harm, "increasing the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition." *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1449–50 (11th Cir.1991); *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (antitrust laws were enacted for the "protection of competition, not competitors"); see *also* 2 Areeda & Hovenkamp, Antitrust Law, ¶ 362 ("Compensation for that injury must be consistent with the purposes of anti-

trust law generally and with the rationale for condemning the particular defendant").

■■■ In the present case, Plaintiffs must demonstrate the existence of antitrust injury. This can be accomplished by establishing that the Defendants changed their behavior in an anti-competitive way such as an increase in the price of anesthesia beyond competitive levels or a decrease in the output or quality of care decreased. *See Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 31 n. 52, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) ("The record simply tells us little if anything about the effect of this arrangement on price or quality of anesthesiological services"); *Oksanen v. Page Memorial Hospital,* 945 F.2d 696, 708–09 (4th Cir.1991) ("[T]he fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute antitrust injury"). Because the HCFA sets the prices for anesthesia in Medicare and Medicaid cases, Defendants cannot exercise any potential market power to raise the price for anesthesia services in those cases. In such public-pay cases, the rate of reimbursement is fixed. Regarding private-pay patients, Plaintiffs offer little support for their contention that fewer CRNAs in the labor force will result in higher anesthesia prices.[6]

■■■ Plaintiffs contend that the removal of CRNAs as hospital employees results in public antitrust injury because CRNAs are no longer available to thwart the alleged "double-billing" and Medicare fraud. Such an injury, however, is not the type the antitrust laws were designed to prevent. As such, it does not constitute a legally cognizable "antitrust injury." Plaintiffs boldly assert several other types of injury but provide no record support for these assertions, offering instead "to present extensive testimony and evidence at trial ...." Pls.' Mem. in Opp'n to Dfs.' Mot. for S.J., at 51; see also *Robles, M.D. v. Humana Hospital Cartersville,* 785 F.Supp. 989, 999 ("[Plaintiff] has only made conclusory statements and unsupported allegations concerning what might happen in the future

---

6. Plaintiffs' expert, Dr. Jerry Cromwell, draws vague conclusions and speculates about the impact of the termination of the CRNAs. On the issue of antitrust injury, the Cromwell report does not offer empirical evidence similar to that of Defendants' expert, Dr. William Lynk. As a result, it does not effectively refute the findings of Dr. Lynk.

to obstetric prices if he is not allowed to compete in this particular ... market").

Plaintiffs rely on Judge Davis' decision that they established sufficient antitrust injury to withstand Defendants' motion to dismiss. Judge Davis' Order, however, was issued prior to the completion of discovery. Based on the fully developed record, Plaintiffs have failed to demonstrate a triable issue as to the existence of antitrust injury. Further, even if this Court were to find that Plaintiffs have satisfied the requirement of demonstrating antitrust injury, there are alternative grounds, discussed below, for granting Defendants' motion for summary judgment.

### B. Conspiracy

Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is declared to be illegal." 15 U.S.C. § 1. The statutory language, however, is not strictly interpreted; such an interpretation would clearly encompass many legitimate, competitive activities. *See United States v. Topco Assocs.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). The Supreme Court recognized that the Act was intended to prohibit only unreasonable restraints of trade. *Board of Trade of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) ("The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition").

To establish a claim under § 1 of the Sherman Act, a plaintiff must demonstrate: (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce. *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1410 (9th Cir.1991). The first element of a § 1 case requires that defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Concerted action forms the essence of a § 1 claim; unilateral actions do not give rise to antitrust liability under § 1. *Willman v. Heartland Hosp. East*, 34 F.3d 605, 610 (8th Cir.1994).

Although Rule 56 requires that "the inferences drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion, ... antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. In *Matsushita*, the Supreme Court clarified the nature and extent of a plaintiff's burden in establishing proof of a conspiracy that violates § 1. The Court held:

> [C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment ..., a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently. [Plaintiffs] ... must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.

*Id.* at 588, 106 S.Ct. 1348 (citations omitted).

In a recent case interpreting *Matsushita*, the Eighth Circuit rejected plaintiffs' contention that the district court "usurped the jury's function by inferring lawful conduct from defendants' descriptions of the marketplace." *Corner Pocket of Sioux Falls, Inc. v. Video Lottery Technologies, Inc.*, 123 F.3d 1107, 1112 (8th Cir.1997). The Eighth Circuit commented: "Because 'antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case,' the court must necessarily weigh the summary judgment evidence of both parties in determining whether plaintiffs' evidence 'tends to exclude the possibility that the alleged conspirators acted independently.'" *Id.* (citing *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348).

In the present case, Plaintiffs rely primarily on evidence of "parallel conduct" in an effort to demonstrate the existence of a conspiratorial agreement. Plaintiffs allege that the hospitals terminated their CRNAs at approximately the same time, with the same motivation, and in a similar manner.[7] Plaintiffs contend that the similar courses of action undertaken at Unity/Mercy and St. Cloud Hospital compel an inference of conspiracy. According to Plaintiffs, the Grindal letter provided a "blueprint" for this purportedly tacit collusion.

■ Many courts have examined the issue of conscious parallelism in the context of parallel pricing in oligopolistic markets.[8] Although the instant case does not involve parallel *pricing*, the fundamental tenets of conscious parallelism are applicable. It is possible to infer the existence of an agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence—often referred to as the "plus factors." *In re Potash Antitrust Litigation*, 954 F.Supp. 1334, 1350 (D.Minn. 1997) (citing *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1456 n. 30 (11th Cir.1991)).

A plaintiff, for example, may satisfy the "plus factors" requirement by demonstrating that the conspirators acted against their own self-interest by engaging in the parallel conduct or that a high-level of interfirm communication existed in conjunction with the parallel actions. *See e.g.*, *Petruzzi's IGA v.*

*Darling–Delaware*, 998 F.2d 1224, 1242 (3rd Cir.1993); *Market Force, Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1172 (7th Cir. 1990); *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 883 (8th Cir.1978) (requiring additional evidence such as evidence that the parallel conduct was "inconsistent with the self-interest of the individual actors"). "[W]here an examination of the proffered 'plus factors' leads to an equally plausible inference that merely interdependent behavior is at hand, then there is no triable issue that would preclude a grant of summary judgment . . . ." *In re Potash*, 954 F.Supp. at 1351.

■ Plaintiffs contend that numerous actions taken by Defendant hospitals evidence collusion.[9] However, the only action articulated by Plaintiffs that involves conduct which arguably could be interpreted as contrary to Defendants' self-interest is that Defendant hospitals terminated the CRNAs even though the CRNAs were profitable. Although Plaintiffs criticize the profitability analysis conducted at Defendant St. Cloud Hospital, Plaintiffs do not affirmatively demonstrate that the hospitals acted against their own self-interest in terminating the CRNAs. Plaintiff's bald assertion that "it is clear that shifting CRNAs off of the hospital payroll and onto the MDA payroll actually substantially *increased* the cost of anesthesia" is insufficient to constitute a 'plus factor.' Even if true, this assertion, which is offered with little factual support, merely indicates

7. Plaintiffs allege that Defendants engaged in conscious parallelism in an effort to eliminate CRNAs as competitors. The allegations of parallel behavior include the following: "Defendant MDAs secretly approached the Defendant hospitals to terminate their CRNA employees and later lied about the communications to make it appear the hospitals had independently decided to do so;" "both hospitals used operations improvement-type vehicles as a smoke screen to terminate the CRNAs;" "both hospitals claims [sic] that they terminated the CRNAs because they were losing money even though the facts demonstrate that CRNAs were profitable;" "both hospitals used severance as a carrot and a stick to force CRNAs to work for the MDAs;" "both hospitals refused to meet with CRNAs individually or jointly;" "both hospitals excluded CRNAs from the restructuring process;" "both MDA groups refused to allow CRNAs to see their contracts with the hospital prior to being employed

by the MDAs . . .;" "both MDA groups hired Ted Grindal and his firm to represent them . . .;" "both hospitals and MDAs negotiated indemnifications from the hospitals to the MDAs to pay their legal fees . . .;" "both hospitals threatened to bring in the same . . . national temporary anesthesia services agency . . .;" "the MDAs at both hospitals made similar statements to the effect that CRNAs got what they were asking for by obtaining the right to direct bill . . . .'' Pl.'s Mem. in Opp'n to Dfs.' Mot. for S.J. at 19–24.

8. An oligopoly is a market containing only a few sellers, in which all sellers recognize that they are primarily interdependent. Consequently, an oligopolist seller will likely account for its competitor's reactions in determining output and prices. VI Areeda, § 1410b at 65.

9. *See supra* note 6 (listing allegedly collusive or parallel conduct).

that the cost to the consumer or third party payer increased. Plaintiffs do not address whether the decision was economically efficient for the hospitals. To be a 'plus factor' the action must be against the interest of each defendant hospital; accordingly, Plaintiffs have failed to establish that this is a 'plus factor' based on the contrary to self-interest analysis.

Plaintiffs do not explicitly contend that the level of interfirm communication is sufficiently high to constitute a 'plus factor.' Plaintiffs suggest, however, that information was channeled between hospitals and professional associations through Theodore Grindal and Al Tank. There is a paucity of sufficient evidence to support this allegation of channeled communication. Defendants concede that three telephone conversations occurred in which anesthesia was discussed: one between St. Cloud Hospital President John Frobenius and Unity/Mercy Hospital President Bill MacNally; one between Frobenius and Unity/Mercy Vice President John Murphy; and one between St. Cloud Hospital Vice President Linda Chmielewski and Murphy. Defendants contend that the brief conversations occurred after Unity/Mercy publicly announced the reorganization of the anesthesia department in July 1993.

Plaintiffs also allege that a number of documents found in the files of AASC could only have come from Unity/Mercy. The documents, most of which are of unknown origin, are neither quantitatively nor qualitatively sufficient to satisfy the requirement for 'plus factors.' The three brief telephone conversations and the documents identified by Plaintiffs do not constitute the requisite high-level of interfirm communication, which "viewed in conjunction with paralleling acts, can serve to allow a jury to reasonably infer a conspiracy." *See In re Potash*, 954 F.Supp. at 1351 (citing *Market Force Inc.*, 906 F.2d at 1172). Given these facts, even when viewed in the light most favorable to the non-moving party, it is equally plausible that the Defendant hospitals acted independently, in response to market conditions, in terminating their respective CRNA employees.

Plaintiffs also rely on the affidavit of a CRNA from Florida, Randolph Harvey, to indicate the existence of an agreement. Harvey allegedly overheard Defendant Craig Johnson, an anesthesiologist at St. Cloud Hospital, talking with several people at a breakfast meeting in May 1993. Harvey allegedly heard Johnson say: "We have a way to take care of CRNAs in Minnesota to gain control of anesthesia without worrying about antitrust. We will get the hospitals to fire the CRNAs and force them to work for us, or the CRNAs may apply for privileges as private contractors with the hospital. ..." Harvey Aff., ¶ 4.

In *Bolt v. Halifax Hosp. Medical Ctr.*, 891 F.2d 810 (11th Cir.1990), *cert. denied*, 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990), the Eleventh Circuit Court of Appeals held that similar statements were insufficient as a matter of law to establish a conspiracy. The plaintiff in *Bolt,* a physician whose privileges had been revoked at three different hospitals within two months, alleged that the hospitals and others conspired to unreasonably restrain trade. Bolt testified that one of the defendant physicians made the following statements to the credentials committee at one of the hospitals:

> "Listen, here's the plan. They're going to get rid of [Bolt] at [Halifax Hospital]. That means we're going to get rid of him at [Orman Beach Hospital] and I think because the other two hospitals are going to get rid of him, we've got to seriously think of getting rid of him at [Daytona Community Hospital]."

*Bolt,* 891 F.2d at 826. The Eleventh Circuit held that the statements were insufficient to permit an inference of conspiracy. The court opined: "Viewed in the light most favorable to Dr. Bolt, the evidence merely establishes that the decisionmakers at each one of the three hospitals based their decisions at least in part on matters that occurred at the other two hospitals." *Id.* at 827.

Similarly, when viewed in the light most favorable to Plaintiffs, the Harvey affidavit does not refer to an agreement between Defendants to terminate the CRNAs. It is equally plausible that the statements attributed to Dr. Johnson merely reflect his own interpretation of the situation at St. Cloud Hospital. As in *Bolt,* the statements do not

evidence *concerted* action or an *agreement* of any kind.

The Defendants' actions were equally consistent with permissible, legitimate business conduct as they were with an illegal conspiracy. Consequently, Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact on the element of conspiracy.

### C. Reasonableness of Restraint

Despite the conclusion that Plaintiffs have failed to demonstrate a contract, combination, or conspiracy, the second prong of a § 1 claim will be addressed to assess whether there is a genuine issue of material fact regarding the reasonableness of the alleged restraint. "[A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be 'per se' unreasonable, or because it violates what has come to be known as the 'Rule of Reason,' under which the 'test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'" *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 457–58, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986) (citation omitted).

### 1. The Per Se Rule

■ If a court determines that the challenged behavior falls within the discrete category of conduct that is illegal per se, a plaintiff need not establish its anti-competitive effects. *Flegel, D.O. v. Christian Hospital, Northeast–Northwest,* 4 F.3d 682, 686 (8th Cir.1993). In the present case, Plaintiffs assert that because Defendants' conduct resulted in the exclusion of a class of medical service providers, Defendants' actions are so manifestly anti-competitive that they are illegal per se.

Most courts of appeals, including the Eighth Circuit Court of Appeals, have examined the denial or revocation of hospital privileges primarily under a rule of reason rather than per se analysis. *Flegel, D.O. v. Christian Hospital, Northeast–Northwest,* 4 F.3d 682, 686 (8th Cir.1993) (citing *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 708–09 (4th Cir.1991) (en banc), cert. denied, 502

U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137, (1992); *Bhan v. NME Hosp., Inc.,* 929 F.2d 1404 (9th Cir.1991), cert. denied, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991); *Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1445 n. 1 (9th Cir.1988); *Goss v. Memorial Hosp. Sys.,* 789 F.2d 353, 354–55 (5th Cir.1986)). In *Bhan,* the Ninth Circuit Court of Appeals addressed the applicability of per se analysis in the context of group boycotts, such as the one alleged in Count 1 of Plaintiffs' Complaint. The court determined that "the per se rule should be invoked for a group boycott when the challenged activity would almost always tend to be anti-competitive." *Bhan,* 929 F.2d at 1412.

Significantly, in a situation very analogous to the present case, the plaintiff in *Bhan* alleged that physicians conspired with a hospital to allow only physician, rather than nonphysician, providers to offer specific medical services. The court recognized that under certain circumstances, "the practice of excluding nonphysician providers as a class would appear to be anti-competitive." *Id.* The court determined, however, that under some circumstances "the choice of physician over nonphysician providers may actually sharpen competition by making [the hospital] a more attractive competitor in the patient market." *Id.* As a result, the court held that the rule of reason was applicable, because the practice of excluding nonphysicians was not one that would always have an anti-competitive effect. Adopting this analysis, the Court will examine the challenged conduct under the rule of reason.

### 2. Rule of Reason Analysis

■ In assessing the legality of a restraint of trade under the rule of reason, courts focus on the detrimental effects to competition. *Flegel,* 4 F.3d at 687. A plaintiff may demonstrate the existence of detrimental effects in one of two ways. *Id.* (citing *IFD,* 476 U.S. at 460–61, 106 S.Ct. at 2019). First, a plaintiff may delineate a relevant market and show that the defendant has enough market power to significantly impinge on competition. *Bhan,* 929 F.2d at 1413; *see also* 7 Phillip Areeda, Antitrust

Law ¶¶ 1507, 1511 (1986). Second, a plaintiff may demonstrate that the challenged practice has actually produced significant anti-competitive effects. If a plaintiff demonstrates the existence of actual detrimental effects, formal market analysis is unnecessary. *FTC,* 476 U.S. at 460–61, 106 S.Ct. at 2018–19.

■■■■ "Either showing—market power or actual detrimental effects—shifts the burden to the defendant to demonstrate pro-competitive effects." *Flegel,* 4 F.3d at 688. If the defendant satisfies this burden, the burden then shifts back to the plaintiff to demonstrate that any legitimate objectives could be achieved through substantially less restrictive means. *Id.* (citing *Bhan,* 929 F.2d at 1413). The court then weighs the benefits and detriments to determine if the conduct is reasonable "on balance." *Id.*

#### (a) Actual Detrimental Effects

■■ In the present case, Plaintiffs assert, albeit in a footnote, that "there is proof of actual detrimental effects, to wit: an actual increase in the price of anesthesia as a result of CRNAs being forced to leave hospital employment and to work for MDAs." [10] Despite this assertion of alleged "fact," there is a dearth of evidence indicating Defendants' conduct actually had an adverse impact on competition. As previously discussed, there has been no showing that the price of anesthesia services has increased substantially, that the output has decreased, or that the quality has declined. [11] Plaintiffs cannot demonstrate a genuine factual issue regarding the existence of actual anti-competitive effects.

10. Plaintiffs cite to successive pages in their memorandum in support of this proposition. The cited pages, however, do not contain any significant evidence of an increase in the price of anesthesia. Moreover, Plaintiffs' memorandum is not evidence properly before the Court.

11. Plaintiffs assert, through the affidavit of Ladonna Schweer, that the quality of anesthesia services has declined at the Defendant hospitals since the termination of CRNAs as direct hospital employees. Schweer's affidavit recites inadmissible hearsay from another employee "that, based on her personal observations since the CRNAs at Unity and Mercy were terminated as employees of the hospital, the quality of care in

#### (b) Market Power

■■ Because Plaintiffs failed to show actual detrimental effects, Plaintiffs must instead demonstrate that Defendants have market power in a well-defined relevant market. *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 318 (8th Cir.1986). Relevant markets are defined both in terms of product and geography. *Flegel,* 4 F.3d at 689; *Morgenstern v. Wilson,* 29 F.3d 1291, 1296 (8th Cir.1994). A geographic market is that geographic area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Morgenstern,* 29 F.3d at 1296.

Plaintiffs assert that the definition of the relevant market is a factual inquiry which is typically reserved for the jury. The Eighth Circuit, however, has held that market definition, like any issue, "is subject to summary judgment if the Plaintiffs fail to provide sufficient evidence from which a jury could reasonably find in their favor." *Flegel,* 4 F.3d at 690 (citing *Assam Drug,* 798 F.2d at 317; *Bhan,* 929 F.2d at 1413 n. 9).

Plaintiffs allege unreasonable restraint of trade in two product markets: (1) the labor market for CRNA services; [12] and (2) the market for anesthesia services to customers. Regarding the labor market for CRNA services, Plaintiffs concede that the market is national or potentially larger in scope. Cromwell Rebuttal Report, at 3–4 ("[Dr. Lynk] rightly concludes (paragraph 27) that so long as a sufficient number of these providers [MDAs and CRNAs] remains geo-

those hospitals has decreased rather than increased." Stone Aff., Ex. 14, at 2. Moreover, the notes purportedly offered in support of these conclusory statements merely contain critiques of recent services. Without any reference to prior delivery of services, the notes are not probative of any *increase* or *decrease* in the quality of care.

12. Plaintiffs attempt to address the labor markets for both CRNAs and MDAs. Plaintiffs' expert, however, concedes that "the defendant hospitals have no power to alter the national average income of anesthesiologists." Cromwell Rebuttal Report, at 3–4.

graphically mobile, their tendency to locate in areas where demand is highest prevents local anesthesia providers from being insulated from the national conditions of supply and demand"). The deposition testimony of CRNAs affirmed that the labor market for anesthesia providers is national. CRNA depositions revealed significant, interstate job mobility among CRNAs who received job offers or accepted employment in other states as a result of the reorganizations at issue in this case. *See* Lynk Report, Table 5, Fig. 2. Because the labor market for CRNA services is national, the Defendant hospitals have no power to impact the market. Consequently, there is no factual issue regarding the labor market that would preclude summary judgment.

The market for anesthesia services requires more detailed analysis.[13] Although Judge Davis noted that Plaintiffs' Complaint alleged anti-competitive conduct in three different potential markets, Plaintiffs have settled on a theory of atomized markets for St. Cloud Hospital and the Allina system, which includes Mercy, Unity, United, St. Francis, and the Phillips Eye Institute.

### i. The Allina System

Defendants contend that the seven-county Twin Cities metro area is the appropriate geographic market within which Allina hospitals compete for patients. Defendants maintain that using the metro area to define the market parameters is actually underinclusive of the relevant geographic market. Nevertheless, Defendants conclude that even this under-inclusive benchmark results in a finding of insufficient market power. Plaintiffs assert: "We disagree with the approach of using the entire 7–county area as the single market area for the five Allina hospitals. . . . We believe that the true market areas of the Allina hospitals need to be parsed out one by one." Cromwell Rebuttal Report, at 14.

Defendants' expert, Dr. Lynk, defines the geographic market for Allina hospitals using a technique referred to as the Elzinga–Hogarty ("E–H") method. The E–H test is a method created by professors of economics, Kenneth G. Elzinga and Thomas F. Hogarty, "to analyze patterns of consumer origin and destination and to identify relevant competitors of the merging entities." *FTC,* 69 F.3d at 264. The E–H approach involves adding counties to Allina's market area until 90% of its surgical patients are included within that geographical area. The method is premised on the simple notion that if a hospital draws a significant number of patients from a county, it is competing for patients in that county, and consequently, that county should be included in its market area. *See generally* Lynk Report; Cromwell Rebuttal Report, at 5.

Using patient origin data and the E–H method of market definition, Defendants' expert, Dr. Lynk, determined that Allina's relevant geographic market was at least as large as the Twin Cities metro area. Within this market, he concluded that the Allina Defendants had a market share of 31%. Such a market share is insufficient as a matter of law to constitute market power.[14] *See Jefferson Parish,* 466 U.S. at 26–27, 104 S.Ct. 1551 (30% market share is insufficient to infer market power even in the face of " 'market imperfections' that permit petitioners to charge noncompetitive prices for hospital services. . .").

Plaintiffs' expert, Dr. Cromwell, rejects the E–H approach and favors a formulation articulated by the Justice Department. The Justice Department approach "seeks to identify a geographic market area such that a hypothetical firm that was the only present and future producer or seller of the relevant product in that area could profitably impose a small but significant and nontransitory increase in price." Cromwell Rebuttal Report, at 7. Under this analysis, Dr. Cromwell contends that "St. Cloud and Mercy & Unity

---

**13.** Because anesthesia is provided attendant to surgery, surgical statistics may be used as a proxy indicating the proportion of anesthetics provided at a given hospital.

**14.** Plaintiffs rely on *Oltz v. St. Peter's Community Hospital,* 861 F.2d 1440 (9th Cir.1988) in support of their antitrust claims. *Oltz,* however, is distinguishable because the defendants in that case had an 84% market share. Also, the plaintiff CRNA in *Oltz* was prevented from delivering any anesthesia services, unlike Plaintiffs in the present case.

Hospitals definitely enjoy such market power in their 20–25 mile market areas." *Id.* Plaintiffs, however, provide little information regarding how and in what context the Justice Department implements their preferred approach. Similarly, Plaintiffs cite no case in which such a methodology is used. Despite Plaintiffs' criticism of the E–H test, the methodology has been accepted by the Eighth Circuit. *FTC,* 69 F.3d at 264.

Plaintiffs also use mileage figures to delineate the relevant markets. To that end, Plaintiffs' expert, Dr. Cromwell, selected distances of 10 miles and 25 miles as parameters within which to define the relevant market. Plaintiffs, however, fail to provide significant factual or legal support for the use of these particular distances as benchmarks. Dr. Cromwell merely offers his opinion that 25 miles is the maximum reasonable patient travel distance. Cromwell Rebuttal Report, at 12. Dr. Cromwell notes that 25 miles is "the threshold distance the federal government uses to define an 'isolated sole community hospital.'" *Id.* Because none of the hospitals at issue in this case constitute a sole community hospital, the 25 mile benchmark is inapposite and arbitrary, particularly in the absence of any cited authority for the use of this distance in the context of market definition.

Recent decisions by the Eighth Circuit establish a stringent requirement that a party accurately define the relevant market. In *Morgenstern v. Wilson,* 29 F.3d 1291 (8th Cir.1994), the court held that the plaintiff had failed to successfully define the relevant geographic market area, because the plaintiff did not analyze where consumers could practicably turn for alternative sources of the product. *Id.* at 1296–97 ("[Plaintiff's] expert focused upon where Lincoln and Omaha residents *actually* went, as opposed to where

they *could* practicably go, for their cardiac surgery services, and specifically presented insufficient evidence regarding whether or not [defendants'] patients could practicably turn for alternative sources of the product to Omaha or other more distant heart programs").

Similarly, in *Bathke v. Casey's General Stores, Inc.,* 64 F.3d 340 (8th Cir.1995), the Eighth Circuit affirmed the district court's grant of summary judgment on the basis of plaintiff's failure to define a relevant geographic area. As in *Morgenstern,* the court determined that the plaintiff's expert neglected to offer evidence regarding the alternative areas defendants' customers could practicably turn for the products in question. *Id.* at 345; *see also FTC,* 69 F.3d at 269 (criticizing plaintiff's expert's analysis because it merely analyzed current patient flow into and out of the three Joplin hospitals as well as hospitals located within a twenty-seven mile radius of Joplin and therefore provided only "a static, rather than a dynamic, picture of the acute care market in Joplin …"). In the case at hand, Plaintiffs failed to adequately address the question of where consumers could practicably go for alternative sources of anesthesia services, a flaw which is fatal to their definition of the relevant geographic market.

Plaintiffs further contend that an atomized market, which separates the Allina facilities, is more appropriate. Although Plaintiffs' expert, Dr. Cromwell, advocates an atomized market and critiques Dr. Lynk's use of the E–H method, Dr. Cromwell offers no other evidence of the relevant geographic market for the Allina system. Rather, Dr. Cromwell relies on generalized assertions about the oligopolistic nature of the market.[15] *See e.g.,* Cromwell Rebuttal Report, at 16.

---

**15.** Dr. Cromwell opines:

Allina's market share of inpatient and ambulatory surgery for its five hospitals (excluding St. Francis but including Phillips Eye) was 32.84, almost exactly what Dr. Lynk estimated. However, the three hospitals in the Healtheast system enjoyed a 9.4% market share while the four hospitals in the Fairview system (including the University of Minnesota) enjoyed a 27.7% share. This leaves four independents: North Memorial, Methodist, St. Paul–Ramsey,

and Hennepin County. The overall Herfindahl Index for the four independents and the three systems was 2116, above the threshold for anti-trust concerns by the Justice Department. The three systems, alone, generated a Herfindahl Index value of 1935, a value exceeding the Justice Department's threshold. Coupled with the fact that Mercy & Unity Hospitals have a special geographic niche on the northeast side of the Mississippi River, these index values certainly raise anti-competitive concerns.

## ii. St. Cloud Hospital

Dr. Lynk also conducted the first part of the E–H test for the St. Cloud Hospital market and concluded that St. Cloud Hospital obtains 90% of its anesthesia/surgical patients from a ten-county area in central Minnesota. Lynk Report, ¶ 35. Within this area, the hospital has a 34.6 % market share. *Id.* This market share, like that of the Allina system, is not sufficient to constitute anti-competitive market power. *See Jefferson Parish,* 466 U.S. at 26–27, 104 S.Ct. 1551; *Morgenstern,* 29 F.3d at 1296; Lynk Report, ¶ 35.

Dr. Cromwell attempts to counter the conclusions of Dr. Lynk by analyzing St. Cloud Hospital's market share based on seemingly arbitrary mileage figures, including the city limits, ten miles outside the city, and 25 miles outside the city. The shortcomings of Dr. Cromwell's approach become more apparent when one considers the alternative hospitals that are 25–35 miles away and 50–70 miles away. Cromwell Report, ¶ 23. Plaintiffs acknowledge, through Dr. Cromwell, that such alternatives exist but offer no analysis indicating to what extent patients would travel to these facilities in search of anesthesia alternatives. As such, Plaintiffs' proffered market definition is insufficient as a matter of law. *See Morgenstern,* 29 F.3d at 1297.

Plaintiffs have not demonstrated the existence of a genuine issue of material fact concerning the relevant geographic market for anesthesia services with regard to either the Allina system or the St. Cloud Hospital. Plaintiffs have failed to delineate a relevant market in both situations and therefore have failed to show the existence of a factual issue regarding an unreasonable restraint of trade. Plaintiffs' failure to show an unreasonable restraint of trade and their failure to produce evidence of a conspiracy provide alternative grounds for granting summary judgment as

to Plaintiffs' § 1 claims, which are asserted in Counts I, III, and V.

## D. Illegal Boycott

 Count III of Plaintiffs' Complaint alleges an illegal boycott of CRNA labor. Count III specifically alleges that the purported boycott "has had a direct anti-competitive effect on relevant markets...." Complaint, ¶ 87. As discussed above, however, Plaintiffs failed to demonstrate the existence of a genuine issue of material fact regarding anti-competitive effects in a relevant market. Also, the boycott claim cannot withstand summary judgment in light of the fact that many CRNAs continue to practice at the Defendant hospitals.

## E. Tying Claim

 Count V alleges that Defendants conspired to illegally "tie" anesthesiological services to surgical services.[16] Because a successful claim of illegal tying requires proof of legally sufficient market power, it is unnecessary to delve further into the merits of Plaintiffs' tying claim. *See e.g., Jefferson Parish,* 466 U.S. at 13–14, 104 S.Ct. 1551 ("We have condemned tying arrangements when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market"). As discussed above, Plaintiffs have failed to demonstrate that Defendants have market power in the relevant markets.

## F. Monopolization

 Count IV of Plaintiffs' Complaint alleges monopolization, attempted monopolization, and a conspiracy to monopolize, in violation of § 2 of the Sherman Act. Monopolization requires that a defendant possess monopoly power in a relevant geographic market. As discussed above, Allina's market

Cromwell Rebuttal Report, at 16. This is the only evidence proffered by Dr. Cromwell that attempts to quantify market share in the context of the Allina system. It appears, however, that Dr. Cromwell merely aggregates hospitals or systems when it is advantageous to do so.

**16.** Although in *Jefferson Parish,* 466 U.S. 2, 21, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Court

held that markets for anesthesia services and surgical services were sufficiently distinct to allege an illegal tying arrangement, the Court also recognized that this alone did not make an exclusive contract illegal and that there was nothing inherently illegal about packaged sales. *Id.* at 24–25, 104 S.Ct. 1551.

share of 31% and St. Cloud Hospital's market share of 34.6% do not reflect monopoly power. Moreover, Defendants contend, and this Court agrees, that the Defendant hospitals "cannot be liable for monopolizing a service they do not provide," because it is the anesthesiologist groups that actually provide the anesthesia services. Dfs.' Mem. in Supp. of Mot. for S.J., at 59; *see Boczar v. Manatee Hospitals and Health Systems, Inc.,* 731 F.Supp. 1042, 1047 (M.D.Fla.1990).

A claim of attempted monopolization requires a showing of: (1) a specific monopolistic intent on the part of the defendant; (2) predatory or anti-competitive conduct on the part of the defendant in an effort to accomplish an unlawful purpose; (3) a dangerous probability of success; and (4) antitrust injury. *Midwest Radio v. Forum Publishing Co.,* 942 F.2d 1294, 1297 (8th Cir.1991). As discussed previously, Plaintiffs failed to demonstrate antitrust injury, and as such, cannot maintain a claim for attempted monopolization.

The elements of a conspiracy to monopolize claim are: (1) the existence of a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; and (3) specific intent to monopolize. *Baxley–DeLamar Monuments, Inc. v. American Cemetery Ass'n,* 843 F.2d 1154, 1157 (8th Cir.1988). As discussed in the context of § 1 of the Sherman Act, Plaintiffs have failed to demonstrate a genuine factual issue as to the existence of a conspiracy.

### G. Denial of Essential Facilities Claim

Count VI alleges a claim for denial of essential facilities. "To prevail under the essential facilities doctrine, the plaintiff must establish '(1) control of an essential facility by a monopolist; (2) the inability to practically or economically duplicate the facility; and (3) the unreasonable denial of the use of the facility to a competitor when such is economically and technically feasible.'" *Willman v. Heartland Hospital East,* 34 F.3d 605, 612–13 (8th Cir.1994) (internal citation omitted). Because Plaintiffs have failed to demonstrate that Defendants possess monopoly power in any relevant market, Plaintiffs cannot avoid summary judgment on this claim as well. Moreover, many CRNAs continue to provide anesthesia services at Defendant hospitals, albeit within a different employment structure. As such, Plaintiffs cannot sustain a claim for denial of essential facilities.

### H. Supplemental Jurisdiction

By virtue of this Order granting summary judgment on Plaintiffs' federal antitrust claims, the only remaining claims are Plaintiff's state law claims. As such, this Court must decide whether or not to exercise supplemental jurisdiction over the state claims.

Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if: "the district court has dismissed all claims over which it has original jurisdiction, ...." A district court has the discretion to exercise or to refuse to exercise pendant jurisdiction. *Marshall v. Green Giant Co.,* 942 F.2d 539, 549 (8th Cir.1991) (citation omitted). Courts should "exercise judicial restraint and avoid state law issues wherever possible." *Condor Corp. v. City of St. Paul,* 912 F.2d 215, 220 (8th Cir.1990).

Factors a court should consider in deciding whether to exercise supplemental jurisdiction include: the stage of the litigation; the difficulty of the state claim; the amount of judicial time and energy necessary for the claim's resolution; and the availability of a state forum. *Marshall,* 942 F.2d at 549 (8th Cir.1991) (quotation omitted). *See also Hanson v. Hancock County Memorial Hosp.,* 938 F.Supp. 1419, 1434 (N.D.Iowa 1996) (citing *Willman v. Heartland Hosp. East,* 34 F.3d 605, 613–14 (8th Cir.1994)) ("matter may be remanded even after the parties have completed a lengthy and complex discovery process and the court has disposed of a motion for summary judgment just weeks before trial").

Upon a review of all the factors, the Court concludes it will not exercise supplemental jurisdiction. Consequently, Plaintiffs' remaining claims will be dismissed without prejudice, so that they may be considered in an appropriate state forum.

## CONCLUSION

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion for Summary Judgment is **GRANTED** as to all of Plaintiffs' federal antitrust claims (Counts 1 through 6); Defendants' Motion for Summary Judgment is **DENIED** as to Plaintiffs' state law claims (Counts 2, 8, 12, and 16).

2. Plaintiffs' state law claims (Counts 2, 8, 12, and 16) are **DISMISSED WITHOUT PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**